# Analysis of the Racial Impact of the AccuPlacer Tests on the Hiring Process in the City and County of Denver and Estimate of Potential Economic Losses

*In the Matter of*

Marian G. Kerner, and Jacobo Gonzales, on behalf of themselves and all others similarly situated,

v.

CITY and COUNTY of DENVER, a municipal corporation.

Civil Case No. 11-cv-00256-MSK-KMT

*Prepared by*

Charles J. Mullin, Ph.D.
ERS Group
Tallahassee, FL

August 27, 2014

**EXHIBIT 2**

## I.        Introduction

I was requested by counsel for the City and County of Denver (hereafter "city") to review AccuPlacer testing data for individuals who applied for certain jobs with the city for the time period of March 2007 to March 2008 to determine if there is statistical support for the allegation that African American and Hispanic job seekers were impacted differently than Caucasians by the AccuPlacer tests.   I was also asked to determine what impact, if any, this had on their subsequent potential rates of hire and to estimate the corresponding potential economic damages that may result if it is determined that the city is liable.   I was also asked to evaluate and comment on the report of Robert A. Bardwell, Ph.D. and provide an opinion as to whether Dr. Bardwell's analysis is useful in determining if there is statistical support for the plaintiffs' allegations, as well as provide an opinion regarding his damage estimates.[1]   My report is organized as follows:

- Section II contains background information

- Section III describes the documents and data received

- Section IV contains the analysis of the AccuPlacer test

- Section V contains the estimate of potential economic losses

- Section VI contains the assessment of Dr. Bardwell's AccuPlacer test analysis

- Section VII contains the assessment of Dr. Bardwell's calculation of lost earnings and benefits

- Section VIII contains concluding remarks

---

[1] Dr. Bardwell's report is titled "Report Regarding Impact of Race on the Use of the AccuPlacer Test by the City and County Denver for Applicants Seeking Initial Employment and Promotion and Damages Estimate" and is dated July 14, 2014.

I am a labor economist with extensive experience in statistical analyses of employment practices and in the computation of economic loss estimates. I have a Master's Degree and a Ph.D. in economics from The Ohio State University. Since 1997, I have been employed by Economic Research Services Group (ERS Group or ERS) in Tallahassee, Florida. ERS Group is a research and consulting firm whose professionals work with individuals, government agencies, colleges and universities, corporations and other organizations to analyze employment decision-making processes and to compute estimates of the value of alleged economic losses. ERS charges $410 per hour for my services, including testimony. My vita and testimony within the last 4 years are attached to this report as Appendix B. The opinions expressed in this report are based on the data and information currently available to me. Should I receive additional information, I may seek to amend this report accordingly.

## II.      Background

The city/county of Denver is a large and well known metropolitan area within Colorado. As part of their hiring process for the various municipal jobs within the city and county during the time period in question (March 2007 to March 2008), the city posted various job openings and applicants would fill out an application (typically online) for each specific opening as desired. If applicants met the minimum qualifications, they would proceed to the next phase of the application process. During this time period, the city required, as part of the application process, that job seekers take and pass one or two tests prior to becoming eligible for certain job openings. These tests were the AccuPlacer-Writeplacer test and the AccuPlacer-Reading Comprehension test. The specific test(s) required was dependent upon the job being sought,

though for most jobs, applicants were required to pass both tests in order to be deemed eligible for the position.  While the tests themselves were the same regardless of the job being sought, the scores necessary to "pass" the tests and become eligible did vary by job.  For example, applicants for an Administrative Support Assistant III classification were deemed to have passed the Reading Comprehension test with a score of 60 or higher, while applicants for an Agency Support Technician classification were required to score 77 or higher.  Required scores varied across classification titles from 40 to 80 for the Reading Comprehension test and from 6 to 8 for the Writeplacer test.[2]  For certain classification titles, applicants were only required to pass one of the tests.  In most instances where one test was required, it was the Reading Comprehension test, but not always.  Passing score requirements did not vary by job within a classification.[3]  In addition, the number of tests required did not vary by classification title.[4]  Plaintiffs have alleged that the tests were racially biased and therefore proportionately fewer African American and Hispanic applicants passed the tests as compared to similarly situated Caucasian applicants. Plaintiffs allege that this resulted in fewer African American and Hispanic applicants receiving jobs than would have without the test requirements.

---

[2] We received electronic data from counsel for defendants that detailed passing requirements for various jobs and classification titles.  See "All Test Results and Passpoints_rev.xls"

[3] There was a sole exception to this in that one Administrative Support Assistant III job, "LIEAP Agent (On Call ASA III)", required a score of 70, while other ASA III classification jobs required a score of 60.

[4] There were two exceptions, one Water Quality Investigator position which required only one test and a Photo Enforcement Agent job in classification title Administrative Support Assistant IV which required only one test.

### III.    Documents and Data Received

Counsel for defendant provided ERS Group with the following documents and data which provide the foundation for this report:

- July 14, 2014 Report of Dr. Robert Bardwell

- Bardwell Consulting Damage Analysis Workbook.xlsm

- Plaintiffs' and Class Members' Responses to Defendant's Second Set of Interrogatories and Request for Production of Documents to Plaintiffs (Merits Discovery)

- First Amended Complaint for Damages [Class Action] and Demand for Jury Trial electronically filed on July 18, 2011

- U.S. EEOC July 8, 2008 Determination letter

- Plaintiffs' Initial Rule 26(a)(1) Disclosures.pdf

- Defendant's Various Interrogatories and Requests for Production of Documents

- Plaintiff's Various Interrogatories, Requests for Admissions and Requests for Production of Documents

- Documents produced in response to Defendant's First Request for Production of Documents (Plaintiffs' Bates Nos. 000001-000315)

- Plaintiffs' and Class Members' Responses to Defendant's First Set of Interrogatories and Request for Production

- Defendant's Various Disclosures and Discovery Responses to Plaintiffs' Requests for Production and Plaintiffs' Interrogatories

- Defendant's Disclosures and Discovery Responses/Kerner_Master_dataset-14-e-Interog A6v2 - 6-13-14.pdf

- Defendant's Disclosures and Discovery Responses/Kerner Production 2B-Payroll-Details-final - 9-6-13.pdf

4

- Defendant's Response to Interrogatories 1A, 2A, 3A (Kerner Interog 1A 2A 3A – Tested.pdf)

- Defendant's Response to Interrogatories 1A, 2A, 3A, with gender information (Kerner Interog 1A 2A 3A-TestedSex_14-d.pdf)

- Defendant's Response to Interrogatory 4A list of hired applicants (Kerner Interog 4A hired applicants.pdf)

- Defendant's Response to Interrogatory 5A information on Salary and Benefits (Kerner Interog 5A-Salary+Benefits 8 28 2013.pdf)

- Defendant's Response to Interrogatory 6A counts of positions, applicants and hires (Kerner Interog 6A pos app hir.pdf)

- Defendant's Response to Interrogatory 6A counts of positions, applicants and hires by race (Kerner_Master_dataset-14-e-Interog A6v3.pdf)

- All Test Results and Passpoints_rev.xls

- Index of Applications for AccuPlacer Test

- "Kerner Interog 4A hired applicants with Ethnicity.xlsx" and "Kerner Interog 4A hired applicants with Ethnicity (4).xlsx"

- Individual electronic AccuPlacer test score data for applicants during the January 2007 to March 2008 time period ("Neogov data - Denver - SF96991 file from 2013.08.19.xlsx")

- Pay Surveys and Proposed Changes to the Classification and Pay Plan for 2006 to 2014 time period

- Eligibility for Merit Increases and Merit Payments rules effective as of 2007 and 2008

- Merit Increases and Merit Payments rules and Merit Tables effective as of 2011 to 2014 time period

- Pay Ranges  Job Titles 2006, 2007, 2014 - 7-24-14 06 to 14.xlsx

- Career Service Rule 3 (Selection)

- "On Call hours worked average for 2007 2008 2014.08.18.xls" and "On Call hours worked average for 2014 2014.08.18.xls", provided by city HR personnel.

- July 26, 2007 Affidavit of Yvette Martinez

## IV.     Analysis of the AccuPlacer Test

I was requested by counsel for the city to review AccuPlacer test results for applicants who took the test during the March 2007 to March 2008 time period to determine if there is statistical support for Plaintiffs' allegation that African American and Hispanic job seekers were impacted differently than Caucasians by the AccuPlacer tests. An analysis of this type consists of a comparison of the race/ethnicity of similarly situated individuals who took the tests to the race/ethnicity of individuals who passed the tests to determine if there is a difference in their relative proportions. While there is no information on the educational backgrounds or work experience of the various individuals who took the tests to determine if they were similarly situated, there is information about the positions for which they applied. In this instance, it is important to control for the job sought for three reasons. First, it is likely that the applicant pools differ for the various jobs because of different educational backgrounds and experiences, and therefore different likelihoods of passing the tests. The classification titles at issue in this matter include administrative and clerical jobs, public facing customer service jobs, compliance and human resource jobs, as well as maintenance and water quality technician jobs. Second, the number of points required to pass the tests varied depending upon the classification title of the

job sought.[5]  The points required to pass the Reading Comprehension test ranged from a low of 40 for Administrative Support Assistant II to a high of 80 for Contract Compliance Technicians. The Writeplacer test pass level ranged from 6 to 8, again depending upon the classification title of the position sought.  Lastly, the number of tests that applicants were required to pass varied by classification title.  Of the 21 classification titles at issue, 12 required applicants to pass both tests, while the remaining 9 required one test to be passed to become eligible for the position. An examination of the individual test results of both the writing and reading tests shows that there were differences in the average scores and pass rates by classification title.  See Table 1 below.

---

[5] In this case, we are focused on the various classification titles at issue, of which there are 21.  While there are multiple job titles within a classification title, the pass points required are dependent upon the classification title being sought.

**Table 1**
**City and County of Denver**
**Average AccuPlacer Test Scores and Pass Rates**
**by Classification Title**

| Classification Title | Reading Comprehension | | Writeplacer | |
|---|---|---|---|---|
| | Average Score | Pass Rate | Average Score | Pass Rate |
| 311 Customer Service Agent | 80.5 | 77.4% | --- | --- |
| Administrative Support Assistant I | 83.1 | 95.2% | 7.8 | 100.0% |
| Administrative Support Assistant II | 82.6 | 98.2% | 7.9 | 94.4% |
| Administrative Support Assistant III | 87.4 | 92.0% | 8.2 | 82.9% |
| Administrative Support Assistant IV | 87.8 | 84.0% | 8.5 | 76.2% |
| Administrative Support Assistant V | 86.7 | 84.2% | 8.2 | 77.4% |
| Agency Support Technician | 91.2 | 80.9% | 8.3 | 70.5% |
| Animal Control Investigator | 84.5 | 75.8% | --- | --- |
| Aviation Customer Service Agent | --- | --- | 7.6 | 59.5% |
| Contract Compliance Technician | 88.3 | 82.1% | --- | --- |
| Eligibility Technician | 87.8 | 82.1% | 8.3 | 70.7% |
| Executive Assistant I | 91.9 | 84.4% | 8.9 | 81.8% |
| Executive Assistant II | 95.6 | 91.1% | 8.9 | 85.2% |
| Fingerprint Identification Clerk | 90.8 | 93.2% | --- | --- |
| Hotline Operator | 84.4 | 83.3% | --- | --- |
| Human Resources Support Technician | 91.3 | 83.6% | 8.8 | 88.2% |
| Human Resources Technician | 88.7 | 83.3% | 8.9 | 80.0% |
| Maintenance Control Technician | --- | --- | 7.9 | 60.0% |
| Purchasing Technician | 91.8 | 94.4% | 8.1 | 91.4% |
| Vehicle Impound Clerk | 77.6 | 84.4% | --- | --- |
| Water Quality Investigator | 95.3 | 92.9% | 7.9 | 68.1% |

Table 1 shows that the average test score ranged from 78 (Vehicle Impound Clerk) to 96 (Executive Assistant II) for the reading comprehension test and from 7.6 (Aviation Customer Service Agent) to 8.9 (several titles) for the writing test. The reading comprehension test pass rates varied from a low of 76% for Animal Control Investigator applicants to a high of 98% for Administrative Support Assistant II applicants. The writing test pass rates varied even more, with a low pass rate of 60% for two different titles to a high of 100% for Administrative Support Assistant I applicants. A Chi-square test was also performed to determine if there was a difference in the pass rates across the various classification titles. Both the reading and writing tests showed statistically significant differences in pass rates across the titles.

Since both the average score and the likelihood of passing varied across the classification titles of the jobs for which the applicants applied and because the testing requirements varied from one classification title to the next, it is important to examine the impact of the test by controlling for the classification title that the applicant is seeking.  This allows us to determine if the test impacted minority applicants similarly across titles.[6]   The preferred method for examining selection events is a statistical test known as a Fisher's Exact test.  A Fisher's Exact test is a commonly accepted statistical test that measures the likelihood of differences in selection rates between two groups, in this case Caucasian test-takers as compared to African American and Hispanic test-takers.[7]   We can then determine if the outcome observed is statistically significantly different than what is expected in a neutral setting.[8]   I received from counsel for the defendant information on applicants for the classification titles at issue who took or were scheduled to take the AccuPlacer test during the 2007 and early 2008 time period.  There were 16,355 individual records in the electronic data, including 14,016 records for individuals

---

[6] The term minority is used throughout this report.  In each instance, the term minority refers only to African Americans and Hispanics combined.  It does not refer to all minority races and/or ethnicities.

[7] The Fisher's Exact test is similar to a Chi-square, but measures the exact probability of achieving a particular outcome or any outcome that is worse than that observed.  For small sample sizes, the Fisher's Exact test is superior to the Chi-square test because is produces exact probabilities, rather than asymptotic probability estimates.  For larger samples, the tests will produce nearly identical results.

[8] When observed differences have a probability of random occurrence that is 5% or less then they are usually labeled "Statistically Significant."  Generally, social scientists and the courts conclude that differences between two groups (e.g., men compared to women) are statistically significant when the difference has a probability of occurring that is less than 5%.  Social scientists and statisticians have used criteria of "greater than two or three standard deviations" to categorize a result as "statistically significant" for over 75 years.  See, for example, Statistics by Freedman, Pisani, and Purves.  Courts adopted this standard in voting rights cases (e.g., Castaneda v. Partida, 430 U.S. 482, 97 S. Ct. 1272 (1977)) and carried the standard over to equal employment issues in such cases as Hazelwood School District v. U.S., 433 U.S. 299, 308 n.14 (1977) and Teamsters v. U.S., 431 U.S. 324; 97 S. Ct. 1843 (1977).  A difference between two groups that is less than two (or three) standard deviations is consistent with a greater than 5% (or 1%) probability of that difference occurring by chance.  See also:  EEOC v. Federal Reserve Bank of Richmond, 698 F.2d 633 (4th Cir. 1983), where the Court indicated that only a difference greater than 3 standard deviations confirms an inference of adverse disparity.

who were Caucasian, African American or Hispanic.[9]   The test tracking data included information on the individual's name, ID number, job sought, race/ethnicity, the specific AccuPlacer test taken, the score and whether or not the applicant passed the test.  The data also indicated the test date and in some instances a reject reason code.[10]  For each applicant and position sought, a determination was made with regard to whether the applicant passed the required test(s), failed the required test(s), or voluntarily withdrew from the process.  Applicants who voluntarily withdrew from consideration for a particular position were excluded from the analysis of that position.[11]   Fisher's Exact tests comparing Caucasian pass rates to African American and Hispanic combined pass rates were conducted for each of the 21 classification titles at issue.[12]  In instances where an individual applied for multiple position postings within a classification title, their multiple test results are retained and analyzed.  The testing results are analyzed controlling for the position posted and classification title.[13]  The results of the Fisher's Exact tests aggregated to classification title can be seen in Table 2 below.[14]

---

[9] There are records outside the specific time frame at issue and records with no test score, as well as multiple records per individual.  Therefore, the number of records in the final analysis is significantly fewer than the original data received.

[10] Almost all records with a reject reason code had no test score. Reject reasons included, for example, "withdrew from process" or "did not show for testing".

[11] Applicants with test dates prior to 3/1/2007 were excluded from the analysis time period.  If the test date was missing, applicants entering the testing phase of the application process (step entry date)  prior to 2/1/2007 were also excluded from the analysis.

[12] For purposes of these analyses, all other races/ethnicities were excluded from the data.

[13] Analyses were also conducted controlling only for the classification title.  Those analyses produced identical results with regard to which titles had statistically significant differences and which did not.  See Appendix A.

[14] This analysis uses a multiple events exact probability test, a procedure used to aggregate Fisher Exact tests.

**Table 2**
**City and County of Denver**
**Analysis of AccuPlacer Pass Rates**
**by Classification Title**
**African American and Hispanic v. Caucasian Test Takers**

| Classification Title | Number of Minority Test Takers | Number of Caucasian Test Takers | Percent Minority | Number of Minority Passes | Number of Caucasian Passes | Percent Minority Among Passers | Probability | |
|---|---|---|---|---|---|---|---|---|
| 311 Customer Service Agent | 63 | 28 | 69.3% | 44 | 26 | 62.9% | 0.0169 | * |
| Administrative Support Assistant I | 18 | 17 | 51.4% | 18 | 17 | 51.4% | 1.0000 | |
| Administrative Support Assistant II | 592 | 302 | 66.2% | 536 | 293 | 64.7% | 0.0003 | * |
| Administrative Support Assistant III | 595 | 354 | 62.1% | 416 | 310 | 57.3% | <.0001 | * |
| Administrative Support Assistant IV | 1340 | 868 | 59.9% | 787 | 658 | 54.5% | <.0001 | * |
| Administrative Support Assistant V | 26 | 9 | 74.2% | 17 | 6 | 73.9% | 1.0000 | |
| Agency Support Technician | 28 | 16 | 61.8% | 14 | 13 | 51.9% | 0.0931 | |
| Animal Control Investigator | 32 | 49 | 39.5% | 20 | 40 | 33.3% | 0.0712 | |
| Aviation Customer Service Agent | 18 | 17 | 51.4% | 12 | 11 | 52.2% | 1.0000 | |
| Contract Compliance Technician | 40 | 22 | 63.2% | 29 | 22 | 56.9% | 0.0215 | * |
| Eligibility Technician | 529 | 219 | 70.2% | 274 | 164 | 62.6% | <.0001 | * |
| Executive Assistant I | 65 | 74 | 47.0% | 39 | 60 | 39.4% | 0.0046 | * |
| Executive Assistant II | 90 | 87 | 51.4% | 66 | 75 | 46.8% | 0.0143 | * |
| Fingerprint Identification Clerk | 51 | 66 | 43.6% | 46 | 64 | 41.8% | 0.2331 | |
| Hotline Operator | 8 | 3 | 72.7% | 6 | 3 | 66.7% | 1.0000 | |
| Human Resources Support Technician | 33 | 33 | 50.1% | 26 | 30 | 46.4% | 0.1835 | |
| Human Resources Technician | 6 | 4 | 60.0% | 3 | 3 | 50.0% | 0.5714 | |
| Maintenance Control Technician | 8 | 7 | 53.3% | 5 | 5 | 50.0% | 1.0000 | |
| Purchasing Technician | 26 | 28 | 48.2% | 22 | 26 | 45.8% | 0.4004 | |
| Vehicle Impound Clerk | 42 | 14 | 75.0% | 34 | 13 | 72.3% | 0.4239 | |
| Water Quality Investigator | 18 | 25 | 41.6% | 12 | 16 | 42.9% | 1.0000 | |

* Statistically significant at the 5% level.
Minority group includes only African American and Hispanic Test Takers.

The results of these analyses show that there are 8 classification title groups with statistically significant differences unfavorable to minorities and 13 groups which do not show a statistically significant difference in the pass rates. Among the classification titles that show a statistically significant difference, the differences between the proportion of minorities taking the test and the proportion of minorities passing the test ranges from a decrease of 7.6% (for Eligibility Technician and Executive Assistant I applicants) to a decrease of 1.6% (for Administrative Support Assistant II applicants). For the remaining 13 class titles, there are no statistically significant differences. We cannot conclude from these results that the test was racially biased, as Dr. Bardwell has incorrectly done, because there may be differences in the job

qualifications of individuals who took the test.  If those differences in job qualifications are also correlated with both race and the ability to pass the AccuPlacer test, then those differences in job qualifications could explain the different pass rates between minority and Caucasian applicants. We can conclude that there is no evidence to support the allegations of racial bias in the test for applicants within 13 of the 21 classification titles at issue.


V.      **Estimate of Potential Economic Losses**

In order to calculate the potential economic losses of a class of individuals with regard to an allegedly biased test, it is necessary to first determine the number of positions that were likely to have been lost by minorities due to the alleged bias.  While the AccuPlacer test did not have a direct economic impact, it could impact individuals by decreasing the number of positions they would expect to receive given their proportion of the relevant pool.  For example, if minorities represent 50 percent of a given applicant pool, other things being equal we would expect them to receive 50 percent of the jobs.  If the test decreases their proportion within the resultant applicant pool to 30 percent, we would then expect them to receive 30 percent of the jobs.  The impact of the test is the 20 percent reduction in the number of jobs they would be expected to receive.  If in our example there were 10 hires, then the expected number of minority hires has decreased by 20 percent of 10, or 2 hires.  That loss of expected hiring enumerates the impact of the test.

In order to calculate the decrease in expected hiring for minorities due to the test, for each classification title in which there was a statistically significant difference with regard to the AccuPlacer test results, a shortfall was calculated.  As described above, this shortfall is the proportionate decrease of minorities in the applicant pool due to the test, multiplied by the

number of hires into that particular classification title.[15]   As described above, eight of the classification titles had statistically significant differences and for each of those eight titles a minority shortfall in the expected number of placements is calculated.  Those estimated shortfall calculations can be seen in Table 3 below.

**Table 3**
**City and County of Denver**
**Shortfall Calculations**
**by Classification Title**
**African American and Hispanic v. Caucasian Test Takers**

| Classification Title | Percent Minority Among Test Takers | Percent Minority Among Passers | Difference | Number of Hires | Shortfall |
|---|---|---|---|---|---|
| 311 Customer Service Agent | 69.3% | 62.9% | 6.4% | 16 | 1.03 |
| Administrative Support Assistant II | 66.2% | 64.7% | 1.6% | 25 | 0.39 |
| Administrative Support Assistant III | 62.1% | 57.3% | 4.8% | 43 | 2.07 |
| Administrative Support Assistant IV | 60.0% | 54.5% | 5.5% | 117 | 6.35 |
| Contract Compliance Technician | 63.2% | 56.9% | 6.4% | 2 | 0.13 |
| Eligibility Technician | 70.2% | 62.6% | 7.6% | 57 | 4.34 |
| Executive Assistant I | 47.0% | 39.4% | 7.6% | 2 | 0.15 |
| Executive Assistant II | 51.4% | 46.8% | 4.6% | 1 | 0.05 |

Minority group includes only African American and Hispanic Test Takers.

The shortfall counts range from a low of 0.05 for Executive Assistant II to a high of 6.35 for Administrative Support Assistant IV.  While of course the city could not hire partial people and it might be considered odd to consider situations where the shortfall is less than a whole person, potential lost earnings are still calculated.  In these circumstances, the shortfall can be thought of as the probability of hire that was lost.  So for example, while the city could not hire an additional 0.15 of a person into the Executive Assistant I position, we can think of this as a

---

[15] In each case, only Caucasian, African American and Hispanic applicants and hires are considered.  All other applicants and hires are excluded from these calculations.

15% chance they would have hired 1 additional minority and calculate potential lost earnings accordingly.

In order to calculate the potential lost earnings, each of the shortfall counts is multiplied by the expected earnings of those jobs. The expected earnings are a function of when the employment was expected to begin, the salary and benefits, and how long the individuals are expected to remain employed with the city. With regard to employment start date, it is assumed that those with lost opportunities would have an average start date equal to the average start date by classification title of the individuals that were hired or promoted into these titles during the 2007 to 2008 time period in question.[16]

The starting salary for each of the classification titles was estimated by calculating the average starting salary of the individuals that were hired or promoted into these titles during the period in question.[17] Benefit estimates were added based on information provided by the defendant that detailed medical and dental benefits, as well as other city provided benefits.[18] Salaries and benefits for each classification title were then grown based on the historical average annual percent wage increase of the individuals who received those classification titles during the time period and remained with the city through August 1, 2013.[19] These averages were calculated separately for each class title at issue.

---

[16] The average start date by title of those hired was determined from the data produced as a response to Plaintiffs' Interrogatory 4A and "Kerner Production 2B-Payroll-Details-final - 9-6-13.pdf"

[17] The average starting salary figures for each title were determined from the data produced as a response to Plaintiffs' Interrogatory 4A and "Kerner Production 2B-Payroll-Details-final - 9-6-13.pdf". Adjustments were made to the average starting salaries for the proportion of positions that were On-Call positions. On-Call positions were assumed to work 20 hours per week on average. See "On Call hours worked average for 2007 2008 2014.08.18.xls" and "On Call hours worked average for 2014 2014.08.18.xls", provided by city HR personnel.

[18] See response to Plaintiffs' Interrogatory 5A.

[19] See response to Plaintiffs' Interrogatory 4A and "Kerner Production 2B-Payroll-Details-final - 9-6-13.pdf".

It is also necessary to calculate the expected employment end date with the city.  In discrimination cases, if there is some reason to believe the plaintiff(s) would not have worked for the defendant for the rest of their career(s), then the defendant is typically liable for the plaintiff(s) lost income only during the time that the plaintiff(s) could reasonably be expected to work with that employer.  We know that the probability that any given worker would choose to leave their current employer, leave the labor force entirely, become unemployed, or die in any given year is non-zero.  Therefore, it is necessary to determine the likelihood that any given worker would remain with the city from one year to the next and adjust the expected period of employment for these factors.

Two sources of potential turnover rates were examined.  First, turnover projections can be found in the Denver Employees Retirement Plan's most recent Comprehensive Annual Financial Report, dated December 31, 2013.  This is the plan that governs the retirement for the City and County of Denver.  The report's actuarial section details a variety of assumptions regarding withdrawal from service that are used in order to properly fund the city's defined benefit plan.   These were revised in 2013 based on an experience study conducted in January 2013 that examined the 2008-2012 time period.[20]   The report lists rates of separation assumptions by years of service.  The rates listed are likely slightly underestimated as they do not include separation on account of disability or death.  These rates indicate it is expected that 17.9% percent of employees will withdraw from service (either voluntarily or involuntarily) within the first year of employment.  An additional 15.4% would withdraw the year after that and an additional 13.3%, 11.4% and 9.9% would withdraw in each of the subsequent three years.[21]

---

[20] See December 31, 2013 Comprehensive Annual Financial report, page 56.

[21] See December 31, 2013 Comprehensive Annual Financial report, page 59. The Financial report lists males and females separately.  This report lists the average rate across genders.

Thus, after 5 years less than a half (48.1%) of the original employees would be expected to remain with the city.

Turnover rates can also be estimated using data on those hired into the classification titles with shortfalls during the time period at issue. Examination of this data shows that of the 273 individuals receiving one of the classification titles posted during the time period, 75 left the city within the first year, a turnover rate of 27.5%. The rates of turnover for these individuals in subsequent years are 15.2%, 14.9%, 9.1% and 8.5%. It is thus expected that the original shortfall of approximately 11 would have fallen to less than 5 people due to departures and terminations within 5 years. The potential lost earnings are adjusted in each year to reflect the likely turnover rate of individuals who would have received positions.

Lastly, it is necessary to determine an estimate of mitigation earnings. In the case of a single plaintiff, it is typically preferable to use the plaintiff's actual mitigation, assuming a reasonable mitigation effort and reliable information. In the case of a class of plaintiffs, where complete and reliable information is not available regarding actual mitigation, it is necessary to estimate the average mitigation earnings. The estimated average mitigation earnings are a function of several parameters, including when mitigation is assumed to begin, the mitigation earnings estimate itself, and its estimated growth rate, if any. It is also necessary to estimate when plaintiffs are expected to be able to fully mitigate their annual earnings, i.e. achieve earnings on an annual basis equivalent to what they would have received had they not been denied employment.

Given the nature of this case, a shortfall in hiring, it is first necessary to estimate for those who were allegedly denied positions with the city when they would obtain alternative employment. The U.S. Bureau of Labor Statistics ("BLS") provides a variety of estimates of

unemployment duration, including state specific estimates, estimates by race/ethnicity, as well as estimates for specific industries or occupations. The mean duration of unemployment for the U.S. in 2007 was 16.8 weeks and for 2008 was 17.9 weeks.[22] The average duration of unemployment for office and administrative support occupations in 2007 was 17.5 weeks and for public administration workers the average was 20.3 weeks in 2007.[23] In 2008, those same averages were 19.1 and 21 weeks respectively.[24] The mean duration of unemployment for the state of Colorado in 2007 was 14 weeks. For African Americans it was 15.7 weeks and for Hispanics it was 12.7 weeks. [25] Accordingly, we would expect that the class members would be able to obtain employment, on average, approximately 13 to 21 weeks after the time at which they were denied employment with the city. The potential lost earnings calculations in this report assume that plaintiffs would obtain alternative employment 20 weeks from the start date of the lost earnings period for each of the classification titles.

Mitigation earnings were determined using BLS Occupational Employment Statistics ("OES") estimates for the Denver-Aurora, CO MSA.[26] Each of the classification titles at issue was matched, based on job descriptions, to an occupation with similar or lower qualifications and

---

[22] Bureau of Labor Statistics, U.S. Department of Labor, Labor Force Statistics from the Current Population Survey. "Table 30 - Unemployed total and full-time workers by duration of unemployment." 2008 Annual Averages. http://www.bls.gov/cps/aa2008/cpsaat30.pdf

[23] Bureau of Labor Statistics, U.S. Department of Labor, Labor Force Statistics from the Current Population Survey. "Table 32 - Unemployed persons by occupation, industry, and duration of unemployment." 2007 Annual Averages. http://www.bls.gov/cps/aa2007/cpsaat32.pdf

[24] Bureau of Labor Statistics, U.S. Department of Labor, Labor Force Statistics from the Current Population Survey. "Table 32 - Unemployed persons by occupation, industry, and duration of unemployment." 2008 Annual Averages. http://www.bls.gov/cps/aa2008/cpsaat32.pdf

[25] Bureau of Labor Statistics, U.S. Department of Labor, Geographic Profile of Employment and Unemployment, 2007. June 2011. "Table 26 - States: unemployed persons by sex, race, Hispanic or Latino ethnicity, and duration of unemployment, 2007 annual averages." http://www.bls.gov/opub/gp/pdf/gp07full.pdf

[26] Bureau of Labor Statistics, U.S. Department of Labor, Occupational Employment Statistics. Average annual earnings for metropolitan and nonmetropolitan areas available from http://www.bls.gov/oes/tables.htm.

responsibilities within the OES survey data to determine the possible alternative earnings for individuals in each of the separate titles.  For example, individuals who applied for positions within the classification title Executive Assistant II were expected to seek and find alternative employment in a similar title within the OES survey, namely "Secretaries, except legal, medical, and executive".  Initial mitigation earnings estimates for each classification title are based on the average 2007 or 2008 annual wages for individuals in the relevant occupational category. Mitigating benefits are based on data provided by the BLS that detail benefit rates for U.S. workers as a percentage of total compensation for office and administrative support occupations for each of the years from 2007 to 2013.[27]  Mitigation earnings are then grown at the same rate Dr. Bardwell used, the annual percent increase in the average hourly wages for U.S. workers.[28]

Lastly, it is necessary to determine when mitigation earnings in the expected alternative employment would rise to the level of earnings had the individual been hired by the city.  It is expected that alternative career paths for any given worker would, on average, converge over time in terms of overall earnings and benefits.  While there is no publicly available data on alternative career paths, economic theory tells us that if, after obtaining new employment, the individual's rate of pay does not represent compensation standards for their skill level, they can theoretically pursue new employment that does.  An article by Dr. Michael Shahnasarian details the theory and notes that forensic economists often assume that plaintiffs will reach parity with

---

[27] Bureau of Labor Statistics, U.S. Department of Labor, Employer Costs for Employee Compensation Historical Listing, March 2004 to March 2014 (Quarterly). June 11, 2014. "Table 15. Private industry workers, by occupational group: employer costs per hours worked for employee compensation and costs as a percentage of total compensation, 2004-2014.  Office and administrative support occupations."
http://www.bls.gov/ncs/ect/sp/ececqrtn.pdf

[28] Bureau of Labor Statistics, U.S. Department of Labor, Total Private Average Hourly Earnings of Production and Nonsupervisory Employees - Not Seasonally Adjusted - CEU0500000008.

former compensation levels in 3 to 5 years.[29]  Potential economic losses here are assumed to end 5 years after they begin, at which point it is assumed that those denied employment would be able to fully mitigate their damages going forward on an annual basis.  While some class members would not have fully mitigated their losses and some would have mitigation that exceeds their lost earnings, it is assumed that on average individuals would achieve the same level of experience and qualifications that they would have if they had been employed with the city and would have achieved a level of salary and benefits commensurate with those experience and qualifications.

A summary of the potential economic losses for each of the classification titles with shortfalls is listed below in Table 4.  The overall potential economic losses are estimated to be $310,695.

## Table 4
## City and County of Denver
## Potential Lost Earnings
## by Classification Title

| Classification Title | Shortfall | Potential Lost Earnings |
|---|---|---|
| 311 Customer Service Agent | 1.03 | $     33,212 |
| Administrative Support Assistant II | 0.39 | $      7,483 |
| Administrative Support Assistant III | 2.07 | $     30,660 |
| Administrative Support Assistant IV | 6.35 | $   127,077 |
| Contract Compliance Technician | 0.13 | $      4,305 |
| Eligibility Technician | 4.34 | $     99,850 |
| Executive Assistant I | 0.15 | $      4,804 |
| Executive Assistant II | 0.05 | $      3,304 |
| | | |
| Total | 14.51 | $   310,695 |

---

[29] Shahnasarian, Michael.  Front Pay Damage Assessment: A Summary of Vocational and Psychological Considerations in *Journal of Forensic Economics*, Volume XVI, no. 2, 2003.

**VI.      Assessment of Dr. Bardwell's AccuPlacer Test Analysis**

I was also asked by counsel for the city to review and provide an opinion with regard to the July 14, 2014 report prepared by Dr. Bardwell.  Dr. Bardwell analyzed the impact of the AccuPlacer test on African American and Hispanic applicants.  In addition, he also prepared an estimate of monetary damages to Plaintiffs based on the impact.   Dr. Bardwell's report suffers from a number of critical flaws with regard to his methodology and data which cause his analysis of the AccuPlacer test impact to be misleading.  These flaws consequently cause him to greatly overstate the potential economic damages.  In addition, his monetary damage assessment relies on a number of assumptions which are without proper foundation.  These assumptions further inflate his damage assessment.  Accordingly, his report is unreliable as a basis for understanding the impact of the AccuPlacer test or for assessing the potential economic damages for Plaintiffs.

*Dr. Bardwell's Methodology is Flawed*

Dr. Bardwell's July 14 report details the analyses he conducted with regard to the AccuPlacer tests.  In summary, Dr. Bardwell conducted Chi-square tests of the entire set of test takers combined across all jobs to determine if there was an overall disparity in the pass rates of African American and/or Hispanic applicants as compared to Caucasians.  Based on the results of these tests, Dr. Bardwell concludes "…that the AccuPlacer has a consistent preferential impact on white applicants and corresponding negative impact on non-white applicants."[30]

Dr. Bardwell's analysis, and subsequent conclusion, suffers from a number of flaws, chief among them being that Dr. Bardwell did not analyze the testing data by classification title.  Rather, his analysis assumes that all applicants were similarly situated both with regard to

---

[30] July 14, 2014 report of Dr. Bardwell, page 12.

education and experience and other qualifications, and with regard to the conditions required to pass the test(s) and become eligible for employment.   His analysis ignores the fact that 1) applicants for different jobs or classification titles are very likely to have different qualifications, 2) the number of points required to pass the tests changed depending upon the classification title of the position being sought and 3) the classification titles did not all require the same number or type of tests be taken.   Thus two individuals with the same score could have different pass/fail outcomes if they applied for different jobs and should therefore be examined separately.   In addition, his analysis ignores the process by which applicants were chosen for specific openings; namely that applicants competed for jobs with other applicants who were applying for the same opening(s).[31]   They did not compete against *all* other applicants, only against those who applied for similar positions.   It is not clear whether Dr. Bardwell had the data necessary to perform the analysis by job or classification title or to even properly determine which individuals passed the testing requirements for a particular position.   His report does not list nor describe any electronic data files he received, so he may not have been able to perform analyses at a more detailed level.   Regardless, his analysis as conducted is inadequate for the purpose of determining whether or not there is support for the Plaintiffs' allegations that the test disproportionately impacted all African American and Hispanic applicants.

*Dr. Bardwell's Data are Incomplete*

Dr. Bardwell's analysis is also flawed in that the data upon which he relied for his analysis appear to be incomplete.   I received electronic test result data which includes over 14,000 records for Caucasians, African Americans or Hispanics.   While the data contain a

---

[31] See Rule 3 Selection, Rules Revision memo 18C, effective 5/4/2007.  Section 3-30, Part A.  Also, Rule 3 Recruitment and Examination, effective 3/15/2006, Section 3-23.

number of duplicate records, records without test results, and records outside the time frame of interest, it still contains significantly more records than the data upon which Dr. Bardwell relied. In addition, in order to determine how an applicant was impacted by the AccuPlacer tests, it is necessary to evaluate each applicant's set of test records given the job they sought.  In short, his analysis appears to have relied upon data which is missing a large number of observations and is not at the level of detail necessary to conduct a proper analysis.  Therefore any conclusions drawn from the analysis of this data are suspect and possibly misleading.


*Dr. Bardwell's Use of a One-Tailed Test*

Dr. Bardwell's analysis is also flawed in his use of a one-tail test as opposed to a two-tail test.  While Dr. Bardwell is correct in asserting that only excess disqualification of minorities would be probative in terms of the question of whether or not damages are due, the true question is, was the AccuPlacer test race neutral.  We do not know if the AccuPlacer test favored minority applicants, favored Caucasian applicants, or was race neutral.  This information is very probative, particularly if the analyses are conducted by title, as it helps to determine if there was a consistent pattern of statistically significant race impact in either direction.  Typically, the question is largely moot, as both social scientists and courts have relied upon a 5 percent level (when using a two-tail test) to define statistical significance.  When the hypothesis calls for a one-tail test, both social scientists and the courts have relied upon a 2.5 percent level to define statistical significance.  When testing at the two standard deviation level, which a number of courts including The Supreme Court have adopted as appropriate, each of the tails of a distribution contain approximately 2.5 percent of the distribution.  Accordingly, when social scientists perform a one-tail test, they adopt the 2.5 percent level as the threshold for statistical

significance.  In this instance, Dr. Bardwell has advocated for the use of a one-tail test *and* a 5 percent significance level.  His justification for such a decision is that the statistical significance test standard that is more likely to find a violation of the assumption is the preferred test.[32]  In other words, the test that is more likely to cause an inference of discrimination is the preferable test.  By Dr. Bardwell's stated logic, there is no reason not to use a test with a 20 percent, or even a 50 percent significance level.  He states that "the objective of any statistical hypothesis testing should be to successfully identify a likely violation of our assumptions".[33]  This is a misleading statement at best.  The objective of hypothesis testing is not only to correctly identify likely violations of our assumptions, but to also correctly identify non-violations of our assumptions.  All hypothesis testing involves risk of both false positives and false negatives, and the goal is to minimize the risk of either, despite their being at cross purposes.[34]  As Dr. Bardwell notes, this would have no impact on the conclusions he draws from his analyses.  However, this is not a justification for his misapplication of generally accepted standards.  The proper analysis conducted by title could be impacted by his incorrect use of a one-tail test and a 5 percent level for statistical significance, which is contrary to the widely accepted standards of both social scientists and federal courts.[35]

Dr. Bardwell's analysis of the AccuPlacer test suffers from several critical flaws.  He relied upon incomplete data that does not contain many of the test results that need to be examined.  He performed a one tail test at the 5 percent level of threshold for significance, which

---

[32] See July 14, 2014 report of Dr. Bardwell, footnote 8, page 5.

[33] Ibid.

[34] See for example, Statistical Reasoning in Law and Public Policy, Volume I, Joseph L. Gastwirth, Academic Press, Inc., pages 132-133.  For a complete discussion of Type I and Type II error in statistics, see Using Econometrics: A Practical Guide, A.H. Studenmund, Harper Collins Publishers, pages 132-139.

[35] See "Reference Manual on Scientific Evidence", Third Edition.  Federal Judicial Center, 2011, pages 255-256.

is contrary to generally accepted scientific principles and federal courts.  Lastly and most critically, he did not analyze the test in the manner it was used by the city, which was to compare individuals within applicant pools by job.  Each of the classification titles had different applicant pools and different testing requirements, none of which were examined by Dr. Bardwell.  Dr. Bardwell did not at any time analyze similarly situated individuals, and his analysis that lumps all applicants and test takers into one single pool is not useful in determining if there was a pattern by which individuals applying for different titles were impacted similarly.  Accordingly, his analysis is not useful in determining if there is support for the Plaintiffs' allegations that African Americans and Hispanics within the different applicant pools were negatively impacted by the test and therefore less likely to obtain the positions they sought.

## VII.    Dr. Bardwell's Calculation of Lost Earnings and Benefits

I was also asked by counsel for the city to review and comment on the damage analysis contained in Dr. Bardwell's report.  Dr. Bardwell calculates damages by examining the job(s) for which each plaintiff applied as the basis for the salary and benefits each plaintiff would have potentially received.  He then assumes that each plaintiff would remain employed and would continue to suffer lost earnings and benefits from the potential date of hire, either 2007 or 2008 depending on when they applied, until the end of the year 2023, approximately 16 to 17 years. He offsets these lost earnings and benefits with mitigation earnings which have been extrapolated across all 926 class members based on the actual mitigation earnings of 25 of the plaintiffs.  After summing the lost earnings and benefits across class members, he adjusts the total figure based on the probability of being hired, which is identical for all class members.  The

probability of being hired is based on a combination of the results from his chi-square test and the number of positions which the city posted during the time period.  His total damage estimate is $18,353,924.[36]

Dr. Bardwell's damage analysis suffers from a number of flaws, some of which are based on his methodology and some of which are based on his assumptions.  Overall, his methodology and assumptions serve to significantly inflate the potential economic damages and his estimate is unreliable due to these errors.

### *Dr. Bardwell Incorrectly Assumes that All Minorities were Impacted by the AccuPlacer Test*

Dr. Bardwell's first error is that he incorrectly assumes that every plaintiff was similarly impacted by the use of the AccuPlacer test.  His damage analysis is based in large part on his statistical analysis of the AccuPlacer test and the estimated shortfalls which result.  This analysis assumes that every individual who applied for a position with the city was lumped into one large group and considered collectively.  This would mean that not only was every minority applicant impacted by the AccuPlacer test, but that every minority applicant was impacted in the exact same way.  This is not true and does not remotely model the process through which individuals were placed into jobs.  As has been noted earlier in this report, there are a number of classification titles in which the AccuPlacer test had no statistically significant impact by race or ethnicity on the pool of applicants considered for hire or promotion.  For example, all the Administrative Assistant I applicants, 17 Caucasian and 18 African American or Hispanic applicants, passed the test.  Therefore, there could not have been any impact from the test for this group of applicants.  Similarly, there is no support for lost earnings for applicants for positions

---

[36] See July 14, 2014 report of Dr. Bardwell, page 4.

where there was no statistically significant difference in the pass rates, because these differences can be attributed to random chance.  Further, there are a number of positions posted during this time period which the city inevitably chose not to fill.  Regardless of the AccuPlacer impact on the applicant pool, there can be no lost potential earnings if no one (including no Caucasian applicants) was hired into the position as there can be no minority shortfall in those instances.

Because each of the various positions was considered separately, the preferred methodology is to determine the potential shortfalls by classification title, specifically focusing on those in which the AccuPlacer had a statistically significant impact by race or ethnicity.  For each classification title in which there was a statistically significant difference in pass rates, one can then determine the potential shortfall in hiring for that title by increasing the proportion of minorities in the applicant pool to what it would have been without the AccuPlacer tests.  These shortfall counts should then form the basis for the potential economic damages.

### *Dr. Bardwell Incorrectly Bases the Damages on Positions Posted Rather than Positions Filled*

Dr. Bardwell's second critical flaw in calculating the potential economic damages is to base the overall minority shortfall on the number of positions for which the city posted openings, not the number of positions which it eventually filled.  By focusing on the number of posted positions (608) instead of the actual number of hires and promotions (298), this assumption serves to significantly inflate Dr. Bardwell's damage estimate.[37]  This critical error alone inflates Dr. Bardwell's damage estimate by over $9.3 million.

---

[37] Dr. Bardwell's count of positions in his backup file (Bardwell Consulting Damage Analysis Workbook.xlsm) is 608.  The source document that provided that information is "Kerner Interog 6A pos app hir.pdf".  That document also provides the number of hires, 298.

As part of Dr. Bardwell's damage estimate, he calculates the probability of being hired/promoted for each class member.  This is the same number for each class member and Dr. Bardwell's report states the following: "This multiplier is the percentage of Plaintiffs who should have passed the test if it had been race-neutral times the number of positions available divided by the number of applicants who passed the test."[38]   In short, Dr. Bardwell assumes that the increased number of minorities who would have passed the test had it been race-neutral would have an equal chance at the number of "positions posted", not the number of positions filled.  Dr. Bardwell justifies this decision as follows:  "The number of positions is used rather than the number of hires because it is unclear what would limit the number of hires below the number of positions for which Defendant sought applicants.  In addition, Plaintiffs who were disqualified by the AccuPlacer test may have been qualified and able to fill the positions that were available but for which no applicant was hired. For these reasons, the number of positions offered was used to compute the Plaintiffs' chances of being hired had they passed the AccuPlacer test."[39]

Dr. Bardwell's justification is flawed for a number of reasons.  While not expressly stated, his assertion implies that because it is unclear what might cause the city to hire fewer individuals than the number of postings, it apparently must be some form of discrimination in hiring.  In other words, absent the test's alleged disparate impact, the city would have hired more individuals simply because there were additional qualified minorities.  This logic fails for multiple reasons.  First, Plaintiffs have made no direct complaint regarding the job assignment process or results of the process aside from the impact of the AccuPlacer test.  The Complaint has no mention of a racial impact in hiring or promotion for those individuals that passed the

---

[38] See July 14, 2014 report of Dr. Bardwell, pages 7-8.

[39] See July 14, 2014 report of Dr. Bardwell, page 8, footnote 21.

AccuPlacer test, only those that failed.  Thus, there is no reason to assume, as Dr. Bardwell has done, that the city would have chosen to hire individuals for unfilled posted positions if there had been additional qualified minority candidates.  Second, in nearly every instance where there were posted positions that went unfilled, there were Caucasian candidates available who had passed the AccuPlacer tests.[40]   Nevertheless, the city chose not to fill those positions.  Dr. Bardwell assumes that if there had been additional qualified minority candidates, they would have received a proportion of those jobs; jobs that the city chose not to fill even though it had qualified Caucasian candidates.   There is no reason to believe the city would have chosen qualified minority candidates over qualified Caucasian candidates it chose not to hire anyway.   An alternative to Dr. Bardwell's implied assertion is that these positions went unfilled for other, non-discriminatory reasons.  Individuals who were within the HR department of the city during the time period in question indicated that there are a number of reasons that a posted position might go unfilled.  Those reasons include a "90 day rule", which required that hiring be done within 90 days of when a job was posted; otherwise a new posting was required.  In some instances, unfilled jobs were never re-posted and remained unfilled.  Budget cuts also curtailed expected hiring.   HR personnel also indicated that "series recruitment", posting a large number of positions for a specific job type, was common and the number of positions posted was based on an educated guess of how many positions were needed.  If the true number was less than this estimate, posted positions went unfilled.  Postings often went unfilled either due to less turnover than expected in a position, and thus decreased need, or a change in the scope of the position, which would cause a new posting to be issued.  It is also notable that the document upon which Dr. Bardwell relied also indicates that ""Positions" is the count of position numbers attached to a

---

[40] There were 63 instances in which the city hired fewer individuals than the specific posting called for.  In 60 of those cases, there were Caucasian applicants who passed the test and were available for hire.

recruitment. Some positions could be attached to multiple recruitments."[41]  This indicates that some of the position counts on this document are likely to be unreliable due to double counting, and do not reflect a true count of the number of positions which were available.

In short, Dr. Bardwell's contention that "…it is unclear what would limit the number of hires below the number of positions…" is based on a lack of knowledge about the city's posting and hiring processes.  His shortfall estimate does not accurately reflect the additional number of minority hires expected absent the AccuPlacer test.  Thus, his damage estimate based on the number of positions posted during the time period as opposed to the number of individuals actually hired is vastly inflated and unreliable.

*Dr. Bardwell's Assumption Regarding the Damage Time Period Length Have No Foundation*

Dr. Bardwell's estimate of potential economic losses is also significantly inflated by his assumption with regard to how long plaintiffs would have been employed by the city and his assumptions regarding mitigation.  In discrimination cases, unlike personal injury cases, when there is some expectation that the plaintiff(s) would not have worked for the defendant for the rest of their careers, then the defendant is considered liable for the lost income only during the time that the plaintiff(s) could reasonably be expected to work for the defendant.[42]  Dr. Bardwell has assumed that the plaintiffs who were denied employment would have remained employed with the city from their hire date (which he assumes would be 30 days after their application date) through the year 2023.  As most of the positions at issue were filled in 2007, Dr. Bardwell

---

[41] See "Kerner Interog 6A pos app hir.pdf"

[42] See White, Paul F., Josefina V. Tranfa-Abboud and Frederick M. Holt.  The Use of Attrition Rates for Economic Loss Calculations in Employment Discrimination Cases: A Hypothetical Case Study, in *Journal of Forensic Economics*, Volume XVI, no. 2, 2003.

is assuming an average term of employment with the city of over 16 years.  He provides no basis in his report for his assumption that those denied employment would remain employed during the entire back pay period and provides no basis for his assumption that they would continue to remain employed at the city for an additional 10 years into the future.  There are a number of methods which provide a foundation for the decision of determining how long damages should continue.  One possibility is to estimate the potential employment period based on the turnover rates for the employer for individuals in the job(s) in question.[43]  In this case, the information provided by the city indicates that the turnover rates for individuals who began in one of the classification titles at issue during this time period range from 8% to 27% in the first 5 years after receiving these jobs.  After 5 years, approximately 44% of the individuals in these classification titles would be expected to remain employed with the city.  To the extent that information is unavailable, another methodology is to use publicly available information to estimate turnover rates.  BLS information on average turnover rate is available for U.S. workers.  For example, the average annual turnover rate from 2007-2013 for all state and local government industry workers ranged from 14.7 to 16.4 percent.[44]  Based on these rates, it is expected that after 7 years, less than 30% of state and local government workers would remain with their employer.  The Denver Employees Retirement Plan, which governs the defined benefit plan for the city and county employees, also produces annual reports which are publicly available.  These reports' actuarial

---

[43] See White, Paul F., Josefina V. Tranfa-Abboud and Frederick M. Holt.  The Use of Attrition Rates for Economic Loss Calculations in Employment Discrimination Cases: A Hypothetical Case Study, in *Journal of Forensic Economics*, Volume XVI, no. 2, 2003.

[44] The annual total separations (turnover) rate is the number of total separations during the entire year as a percent of annual average employment. Bureau of Labor Statistics, U.S. Department of Labor, Job Openings and Labor Turnover Survey – Annual total separations rates – State and local government – Not seasonally adjusted – JTU92000000TSR.

sections detail estimates of expected turnover rates.  A review of these estimates show expected turnover rates similar to those from both the BLS surveys and the internal city data.

There are also a number of academic papers that discuss the issue of job turnover and attrition.  For example, an article by Robert Trout discusses the probability of remaining with a given employer year over year and estimates that probability at 86 percent.[45]  At that rate, the probability of remaining with a given employer after 7 years has fallen below 35 percent, and after 10 years has fallen to 22 percent.  The probability of any given employee remaining with their employer for the next 17 years, as Dr. Bardwell assumes all of the class members here will do with certainty, is less than 8 percent.  Dr. Bardwell's arbitrary choice of 10 years of front pay and an expected average tenure of approximately 17 years for each employee is unrealistic and has no foundation.  A number of possible data sources were available to guide Dr. Bardwell in his estimate of work-life duration; however he chose to use none of them.  Data from publicly available sources (both city of Denver specific as well as other publicly available data) and academic research both indicate that Dr. Bardwell's assumptions regarding work-life expectancy are excessive and lead to inflated lost earnings estimates.

*Dr. Bardwell's Estimate of Mitigation Earnings is Scientifically Unreliable*

In order to correctly calculate the amount necessary to "make Plaintiffs whole", it is standard practice that economic losses be offset, or mitigated, by the pay and benefits that could have been reasonably obtained from alternative employment.  Dr. Bardwell does reduce the Plaintiffs' potential lost earnings by an estimate of their mitigation earnings over this same time period.  However, Dr. Bardwell's methodology for estimating the mitigation for the entire set of

---

[45] See Trout, Robert R.  Duration of Employment: Update Analysis, in *Journal of Forensic Economics*, Volume XVI, no. 2, 2003.

Plaintiffs is based on a small non-random sample, and therefore unreliable and misleading. Once again, his choice of methodology serves to significantly increase the damages compared to the alternative approach.

Dr. Bardwell's methodology is to calculate a damage amount for each of 926 class members. The potential lost earnings amount for each individual is essentially the difference between the earnings in the job for which they applied at the city and the mitigation they earned. As Dr. Bardwell did not have historical mitigation information for each plaintiff, he needed to estimate it. The mitigation for each of the 926 class members is based solely on the mitigation information supplied by 25 of those class members. It is not clear how those 25 individuals were selected, however it appears they may have been the individuals who responded to the various interrogatories requesting such information. While it is unknown how the information came to be supplied to Dr. Bardwell specifically for those and only those 25 individuals, it is clear that this was a non-random group and therefore likely to not be representative of the entire group of class members. Further, even were this group constructed in a random fashion, the number of individuals is scientifically inadequate for any type of conclusion or estimation across the entire set of class members as a whole. The scientifically acceptable sample size needed to estimate an average for a group is a function of several parameters, including size of the overall population, desired confidence level, amount of acceptable error of the estimate and an initial estimate of the standard deviation. As an example, if one wanted to be 95 percent confident that the estimate of average annual wages from a sample was within $1,000 of the true estimate and assumed a standard deviation of $10,000, for a population of 926 people, one would need a sample of 272 individuals. Dr. Bardwell's non-random sample of 25 Plaintiffs is insufficient and has a high probability of leading to a biased damage estimate.

A more reliable alternative would be to estimate class-wide mitigation based on a statistically valid survey.  The BLS conducts statistically valid surveys which measure average earnings for a variety of geographies and a variety of occupations.  For example, BLS provides OES on average earnings for workers for each of the years 2007-2013 for Denver, CO by occupation.[46]  Unlike Dr. Bardwell's methodology, the OES survey data are conducted using adequate sample sizes for drawing scientifically valid conclusions.  Mitigation estimates using these surveys are much more reliable than those provided by Dr. Bardwell, whose class-wide estimate based on the 25 non-randomly drawn Plaintiffs who responded to certain interrogatories is unreliable and biased.

_Dr. Bardwell Assumes that Plaintiffs will Never Fully Mitigate_

In addition to Dr. Bardwell's misleading source for initial mitigation earnings inflating his damage estimate, his mitigation assumptions also assume that plaintiffs will never fully mitigate their damages on an annual basis.  His mitigation estimates that are extrapolated from his sample of 25 class members are grown at a rate similar to the estimated lost earnings with the city and therefore the gap between the two remains significant, and in fact gets larger, during the entire 17 years over which his damages are projected. Assuming that the class members in question were qualified for the positions for which they applied with the city, we would expect that they would eventually obtain employment commensurate with that skill level. Therefore, in time, we would expect them to be able to achieve, on an annual basis, a salary that is similar to the positions they sought.  While there is no publicly available data that enumerates the amount of time that it takes to achieve parity with a lost employment opportunity, there is forensic

---

[46] OES data surveys data for the Denver-Aurora, CO MSA.

research on the topic.   An article by Dr. Michael Shahnasarian indicates that for displaced workers, "…a period of 3 to 5 years generally suffices for an individual to reestablish his or her career development and stature to previous levels."[47]   While this case involves hiring/promotion and not terminated or displaced workers, many of the considerations are similar, and Dr. Shahnasarian's estimate of 3 to 5 years is very different from Dr. Bardwell's assumption that the pay gap would persist and in fact grow for 17 consecutive years.

### _Dr. Bardwell Incorrectly Bases Lost Earnings on Salary Midpoints, not Starting Salaries_

Dr. Bardwell's estimate of lost earnings is created by assuming that the individuals who were hired or promoted into the jobs they sought would have received salaries at the midpoint of the range for each specific title.   It is highly unlikely that those impacted by the test would receive starting salaries at the midpoint of the range.   It is much more likely they would have received lower starting salaries.   First, these are individuals being placed into these jobs for the first time, either through new hire or promotion into these jobs.   Second, the data on individuals who did receive these jobs around the time period in question show that in each instance, they received lower initial salaries than Dr. Bardwell used for his damage estimate.   For example, Dr. Bardwell assumed that the 2007 salary for 311 Customer Service Agents would be $35,518.   A review of the hired applicant data shows 15 individuals hired into this position around the time period, 11 in 2007 and 4 in 2008.   Every one of the 2007 hires received a starting salary of $28,464 and every one of the 2008 hires received a salary of $28,749.   Thus, Dr. Bardwell overestimates the starting salaries of all 311 Customer Service Agents by more than $7,000.   Dr.

---

[47] See Shahnasarian, Michael.  Front Pay Damage Assessment: A Summary of Vocational and Psychological Considerations in _Journal of Forensic Economics_, Volume XVI, no. 2, 2003.

Bardwell's reliance on midpoint salary data as starting salaries produces a similar overestimation for each of the titles.

### Dr. Bardwell Makes No Adjustment to Lost Earnings for On-Call Positions

Dr. Bardwell's estimate of lost earnings assumes that each of the positions at issue is a full time position. Based on the data provided, this assumption is incorrect.[48] The data detailing those hired or promoted during the time period shows that 8 of the 46 Administrative Support Assistant III positions were for Half-Time or On-Call positions and that more than half (61 of 120) of the Administrative Support Assistant IV positions were On-Call jobs. Payroll data from the city indicates that employees in on-call positions average approximately 20 hours per week.[49] Further, it is my understanding that individuals in these positions do not receive benefits. Dr. Bardwell made no adjustment to his lost earnings estimates to account for the lower earnings and benefits of individuals in on-call positions. This once again serves to inflate his damage estimate.

### Dr. Bardwell Calculates Damages for Individuals Who Were Hired by the City

Dr. Bardwell assumes (or appears to assume) that none of the individual class members for whom he calculates damages received any of the jobs in question, and therefore have the same likelihood of receiving positions as all other class members. An investigation of the detailed hiring information reveals that at least 17 individuals, plus named plaintiff Marian Kerner, were hired by the city in some capacity. In fact, there are five individuals who were still

---

[48] See Kerner_Master_dataset-14-e-Interog A6v3.pdf

[49] See "On Call hours worked average for 2007 2008 2014.08.18.xls" and "On Call hours worked average for 2014 2014.08.18.xls", provided by city HR personnel.

employed with the city as of August 1, 2013.[50]   Nevertheless, Dr. Bardwell calculates and includes full damages for each of those individuals.  Further, he does not include any mitigation information for any of these individuals (including those still employed) in calculating the average mitigation level across all class members.[51]   Once again, calculating full damages for 17 years for class members who received employment with the city and therefore do not appear to be due full damages only serves to inflate Dr. Bardwell's estimate of lost earnings.

### *Dr. Bardwell's Does Not Use a Low Risk Interest Rate in his Estimation*

Dr. Bardwell's use of high grade municipal bonds as the source for his estimated interest also serves to overestimate potential damages.  The expert's use of an interest rate to account for lost interest on damages should reflect an interest rate that is not only achievable by the individual, but that is also relatively risk free, to reflect the fact that the individual is certain to receive the "interest" as part of the damages settlement.  The rate from high grade municipal bonds is a rate that cannot be obtained by individuals without risk.  A more appropriate rate is a U.S. government treasury bill.[52]   U.S. backed bonds have a much lower risk of default and are essentially risk free.  This is a more appropriate rate to use in a situation in which one wants to calculate a certain payoff, such as when estimating damages to be paid to a class.

---

[50] Jennifer Casanova hired 12/12/07, Aubrey Hill hired 2/19/08, Crystal Reyes hired 6/4/07, Ramsy Reyes hired 6/4/07 and Elizabeth Torres hired 5/7/07.

[51] The exception is Marian Kerner, for whom he averages in approximately $3,500 of annual mitigation earnings.

[52] See Gerald Martin, Ph.D., *Determining Economic Damages,* Revision 21 (07/09), page 11-7.  "Most economists use U.S. Government Bonds as the standard investment vehicle for the plaintiff.  Others use U.S. Government Bills, which are the short term treasury securities, or U.S. Government notes, the intermediate securities."

## VIII.   Concluding Remarks

I was requested by counsel for the City and County of Denver to analyze AccuPlacer testing data for individuals who applied for jobs with the city from March 2007 to March 2008 to determine if there is statistical support for the allegation that African Americans and Hispanics were impacted differently than Caucasians by the tests.  I was also asked to estimate the potential economic damages that may have resulted from the test's impact if it is determined that the city is liable.  I was also asked to evaluate and comment on the report of Robert A. Bardwell, Ph.D. and provide an opinion as to whether Dr. Bardwell's analysis is useful in determining if there is statistical support for the plaintiffs' allegations, as well as provide an opinion regarding his damage estimate.

The AccuPlacer tests were administered to individuals seeking certain classification titles with the city during the time period in question.   Individuals who passed the tests were considered eligible for employment and continued through the process for potential employment. Those who failed the tests were no longer considered eligible for the position for which they applied.  While the tests were identical regardless of the position sought, both the number of tests and the requirements for passing the tests were different depending upon the classification title for which the applicant applied.  Analysis of the test data by classification title shows that of the 21 titles, 8 have statistically significant differences that are unfavorable to minority applicants and 13 have no statistically significant difference in the pass rates of minorities as compared to Caucasians.

Potential lost earnings are calculated for applicants to classification titles where there were statistically significant differences in the pass rates of the tests.  Shortfalls in expected hiring are calculated based on the difference in pass rates and the number of individuals that

were hired by the city for each of these classification titles.  Potential lost earnings are based on the size of the shortfalls and the salaries and benefit rates for those positions at the time of expected hire.  Salaries and benefits are grown at the same annual rate as individuals who were hired by the city at that time and interest is added for past losses.  The size of the shortfall is reduced over time to reflect the rate of turnover within these jobs at the city.  Potential losses are then offset by the mitigation that applicants to these positions would be estimated to earn in alternative employment.  The overall estimated potential economic losses are $310,695.

I also reviewed the report and backup materials of Plaintiffs' expert, Dr. Robert Bardwell. Dr. Bardwell's analysis of the AccuPlacer test suffers from a number of critical flaws that render his conclusions misleading.  It appears that Dr. Bardwell relied upon incomplete test data that is missing a significant number of test results during the period in question.  Dr. Bardwell also could not, or chose not to analyze the data in a manner that controlled for the different testing requirements for each classification title.  His analysis that combines all test takers into one single applicant pool does not properly reflect either the testing evaluation process or the application and hiring process at the city at that time.  His analysis is not instructive with regard to the impact of the test on minority applicants for different classification titles and his conclusions based on that analysis are misleading.  Further, without a proper analysis of the qualifications of the test takers, his conclusion that the test was racially biased is improper and without foundation.

In addition, Dr. Bardwell's contention that a one-tail test at the 5 percent level of significance is the proper evaluation of his statistical analysis is without scientific or legal foundation.  The majority of social scientists rely upon a 5 percent level of significance with a *two-tail* test or when using a one-tail test, a *2.5* percent level of significance.  By performing a

one-tail test without the corresponding reduction in significance level, Dr. Bardwell is advocating for an evaluation technique that increases the probability of finding a statistically significant difference.  Further, his position is contrary to that relied upon by the federal courts, including the U. S. Supreme Court.  While his choice of test and significance do not impact his analysis that is based on flawed data and methodology, it could impact a proper examination.

Lastly, I reviewed the damage estimate of Dr. Bardwell.  His estimate is based on a number of methodological flaws and speculative and unsupported assumptions which serve to greatly increase the potential economic losses.  Dr. Bardwell's shortfall estimate is overstated for two reasons.  First, his shortfall includes classification titles in which there were no statistically significant differences in pass rates and therefore calculates a shortfall for minorities for whom there is no evidence supporting the allegations of test impact by race or ethnicity.  Further, Dr. Bardwell bases his shortfall estimate on the number of positions posted rather than the number of hires that occurred during the time period.  This serves to effectively grant damages for non-existent positions.

Dr. Bardwell's damages are also inflated by speculatively assuming that the damages would continue to accumulate from the time of hire and for the subsequent 17 years.  He provides no foundation for this assumption and assumes that every potentially affected individual would work for the city for the entire 17 years.  He makes no provision for turnover of any type.

Dr. Bardwell's damages are also inflated based on his estimate of mitigation earnings, which is based on the interrogatory responses of 25 of the over 900 potential class members.  Dr. Bardwell does not indicate how these 25 individuals were chosen, but it is likely this is a non-random sample of the potential class.  In addition to not meeting the scientifically valid principle

of being a non-random sample, his sample of individuals does not meet the size required to provide a scientifically valid estimate of earnings.

Dr. Bardwell also assumes starting salary estimates based on salary range midpoints rather than the lower end of the range.  This is contrary to the data provided on those who were hired at the time, whose salaries invariably were at or close to the salary range minimums.  Dr. Bardwell also made no adjustment for the limited hours of on-call positions, nor did he adjust his estimate to account for the fact that some class members received jobs with the city.  Lastly, Dr. Bardwell provides interest at a rate that is speculative, as opposed to the risk free interest rates that are more routinely used in damage analyses.

In my opinion, Dr. Bardwell's analysis and estimated losses are fatally flawed and based on a variety of unreliable methods and speculative assumptions. These many speculative assumptions and methods lead to misleading conclusions regarding the impact of the AccuPlacer test and serve to significantly inflate the estimated potential economic losses.


Charles J. Mullin, Ph.D.                                 Date                     August 27, 2014