1              IN THE UNITED STATES DISTRICT COURT

2                 FOR THE DISTRICT OF COLORADO

3              Civil Case NO. 11-cv-00256-MSK-KMT

4

5

6   MARIAN G. KERNER and
    RAMONA J. LOPEZ, on behalf
7   Of themselves and all others
    Similarly situated,
8
            Plaintiffs,
9
        vs.
10
    CITY and COUNTY OF DENVER,
11  a municipal corporation,

12          Defendant.
    _____/
13

14  DEPOSITION OF:          **CHARLES J. MULLIN, PH.D.**

15  TAKEN AT THE INSTANCE OF:  The Plaintiffs

16  DATE TAKEN:             October 30, 2014

17  LOCATION:               113 S. Monroe Street
                            Tallahassee, Florida
18
    COMMENCING:             9:06 a.m.
19
    CONCLUDING:             4:35 p.m.
20

21                   REPORTED BY:

22                   PEGGY OWENS

23          REGISTERED PROFESSIONAL REPORTER

24            REGISTERED MERIT REPORTER

25

**EXHIBIT 3**

85

1    another group in this case, whites.  And there is a

2    statistically difference between those rates based on

3    that statistical test.

4        Q    Would you explain what you mean by that, that

5    when you say there is a statistically significant

6    difference?  Put that to a -- would you explain that

7    to -- as best you can, sir?

8        A    It means that those differences are unlikely

9    to have occurred by chance.

10       Q    Did you quantify the unlikeliness of that to

11   have occurred by chance --

12       A    Yes.

13       Q    -- in your report?

14       A    Yes.

15       Q    And where do you have that in your report?

16       A    It is on Page 11, Table 2.

17            MR. PADILLA:  I know you wanted a break

18       sometime ago, Mr. Nachman.  Do you still need it?

19            MR. NACHMAN:  Yeah.  I will be right back.

20            (Brief recess.)

21   BY MR. PADILLA:

22       Q    Let's look at Table Number 2 that you just

23   referenced, sir.  What's the date that you received the

24   documents that you used to prepare Table 2?

25       A    Well, it wasn't a document.  It was a data

87

1   you able to cite to any source or theory or authority

2   for your deciding to look at these job -- this issue of

3   whether or not the AccuPlacer Test was racially biased

4   by job classification?

5           MR. NACHMAN:  Objection, form of the

6       question.

7           THE WITNESS:  Yes, I can do that.

8   BY MR. PADILLA:

9       Q    Do so, please.

10      A    Either in reviewing documents or speaking to

11  individuals at the City and County of Denver or both, I

12  was made aware that -- a couple things.  First, the

13  number of tests that were required to be taken in order

14  to make it through the testing phase differed by

15  classification title.

16          Also, the number of points -- although the

17  tests were the same, the number of points required to

18  pass the test were different depending on the

19  classification title of the job you were applying for.

20          And then third, I'm not sure it is called

21  labor market theory, but labor economics tells us that

22  the individuals who are applying for these different

23  jobs are very likely to be different in some way,

24  either based on their education or their experience.

25      Q    So the last thing, that the educational

88

1    background of these applicants would be different, you

2    didn't get that from the City, you got that from labor

3    statistics; is that what you are telling us?

4         A    That's correct.

5         Q    And the first two items you said you got from

6    oral communications with the City?

7         A    Oral or written.

8         Q    Okay.  But my -- you know, my question is

9    more basic than that.  What about these three

10   categories would cause you to think that they would

11   have some sort of impact upon whether or not the

12   AccuPlacer Test was race neutral or racially biased?

13   You understand my question, sir?

14        A    I believe so.  If, in fact, the pass points

15   required -- I shouldn't say pass points.  If, in fact,

16   the points required to pass the test are different from

17   one classification title to the next, then it certainly

18   makes sense to analyze those classification titles

19   differently because there is a different probability of

20   making it through that part of the process.

21             Also, if the people in the different

22   groups -- and by group, I mean a classification

23   title -- have different educational backgrounds, then

24   their likelihood of passing the test is also different.

25   And if there is a likelihood -- if the likelihood of

89

1    passing the test is different, then it makes sense to

2    look at those groups separately.

3              (The requested testimony was read by the

4    reporter as follows:)

5              "A    If, in fact, the pass points required

6         -- I shouldn't say pass points.  If, in fact,

7         the points required to pass the test are

8         different from one classification title to the

9         next, then it certainly makes sense to analyze

10        those classification titles differently because

11        there is a different probability of making it

12        through that part of the process.

13             Also, if the people in the different

14        groups -- and by group, I mean a classification

15        title -- have different educational backgrounds,

16        then their likelihood of passing the test is also

17        different.  And if there is a likelihood -- if the

18        likelihood of passing the test is different, then

19        it makes sense to look at those groups

20        separately."

21   BY MR. PADILLA:

22        Q    Did you have any evidence, and do you now

23   have any evidence that job type affects test results?

24             MR. NACHMAN:  Objection, form of the

25        question.

92

1     Q     Well, did you have any basis whatsoever to

2  support that the job classification affects test

3  results?

4          MR. NACHMAN:  Objection, form of the

5     question.

6          THE WITNESS:  Yes.

7  BY MR. PADILLA:

8     Q     What basis did you have?

9     A     Well, two things.  One was the data, itself.

10  And then the second was my experience as a labor

11  economist has -- indicates that the education and

12  experiences of people who seek out different jobs are

13  often different.

14     Q     Okay.  We are going to separate these out

15  into the three categories that you listed.  We just

16  talked -- and I was just focusing on job classification

17  right now, not the education that the persons would

18  have.

19          So just by job classification, what --

20  because those were the three areas that you said made

21  you decide that you should look at whether or not the

22  AccuPlacer Test was discriminatory based upon job

23  classification.  Okay?

24          One of the reasons you said was that their --

25  the pass points were different for the different jobs,

93

1   right?

2        A    Right.

3             MR. NACHMAN:  Object to the form of the

4        question.

5   BY MR. NACHMAN:

6        Q    The other one you said is that the education

7   was different for -- based upon your -- you thought,

8   based upon your labor analysis background?

9        A    I would say it could be different.

10        Q    Could be?

11        A    Correct.

12        Q    That's what you indicated in your report.

13   But you didn't have any proof that it was, did you?

14        A    That's correct.

15        Q    Did you look at the job qualification

16   requirements for the titles listed in Table 2 for

17   various jobs, beginning with customer service agent

18   through water quality investigator?

19        A    Yes.

20        Q    And did you look at the qualifications for

21   each of those persons that applied for each of those

22   jobs for those 21 categories -- excuse me, 21 job

23   classifications?

24        A    I believe you just asked if I looked at the

25   qualifications of those people that applied, and the

94

1  answer is no, I did not look at the qualifications of

2  the people that applied.

3      Q    So how are you able to say that they had

4  different educational backgrounds if you didn't look at

5  it?

6      A    I didn't say they did.  I said they could.

7      Q    Okay.  Well, do you think it is a proper

8  statistical analysis to use a methodology based upon

9  that something could happen?

10          MR. NACHMAN:  Objection, form of the

11      question.

12          THE WITNESS:  Yes.

13  BY MR. PADILLA:

14      Q    Did you conduct the probability or an

15  analysis to determine whether or not your assumption

16  was correct --

17      A    Yes.

18      Q    -- that educational background of the various

19  persons in the job, 21 job classifications shown in

20  Table 2 made a difference as to whether or not they

21  passed or failed the AccuPlacer Test?

22          MR. NACHMAN:  Objection, form of the

23      question.

24          THE WITNESS:  No.

25  BY MR. PADILLA:

95

1      Q    Okay.  So if you didn't do a test on that,

2   how can you use that as a basis for you saying that

3   their educational background was important to separate

4   the pool of applicants for the City and County of

5   Denver into these various job classifications?

6           MR. NACHMAN:  Objection, form of the

7       question.

8           THE WITNESS:  I would say that I would -- I

9       guess I would phrase it this way.  If someone were

10      applying for a job as a judge, and someone were

11      applying for a job as a janitor, and you gave them

12      the same test, it is likely that they would have

13      different probabilities of passing that test.

14   BY MR. PADILLA:

15      Q    But you didn't test any of that.

16      A    I'm not sure what you mean by you did not

17   test any of that.

18      Q    Well, did you look at the deposition of

19   Aneecia Naneucli or Delonzo Alexander?

20      A    I believe I have Ms. Naneucli's deposition.

21   I believe I did scan it.  Looked at it to some extent.

22   I don't recognize the other name you gave me.

23      Q    Delonzo Alexander, you don't recognize that?

24      A    No.

25      Q    So did you look at deposition testimony in

96

1    preparation for your testimony today?

2        A    I did not look at it in preparation for my

3    testimony today.

4        Q    When I say looked at it, did you read the

5    deposition of Ms. Naneucli?

6        A    I would say I scanned through it to some

7    extent.

8        Q    Okay.  And what does that mean?

9        A    It means I did not read it word for word.  I

10   looked at some pages, and occasionally I would read

11   some passages, and the rest I skipped.

12       Q    For what purpose?

13       A    Just to understand information, more

14   information about the case.

15       Q    Okay.  You saw that Ms. Naneucli had a

16   four-year college degree at the time that she took the

17   AccuPlacer Test, right?

18       A    That does sound familiar.

19       Q    Okay.  And Ms. Naneucli had a higher

20   education than many of the other people applying for

21   the ASA IV position, to be a --

22            MR. NACHMAN:  Object to the form.

23   BY MR. PADILLA:

24       Q    She wanted to return to the former job that

25   she had with the City and County of Denver to be in the

97

1    LIEAP program?

2         MR. NACHMAN:  Objection, form of the

3    question.

4         THE WITNESS:  I'm not sure I understand what

5    the question was.

6    BY MR. PADILLA:

7    Q    Do you remember her saying, testifying to

8    that effect?

9    A    I don't --

10        MR. NACHMAN:  Same objection.

11        THE WITNESS:  I don't remember her testifying

12   as to what job she wanted.  I don't recall that.

13   BY MR. PADILLA:

14   Q    Okay.  Do you recall her having a four-year

15   college degree?

16   A    I do recall that.

17   Q    Okay.  So even though she had a four-year

18   college degree, she had failed the AccuPlacer Test.

19   Did you see that?

20   A    I believe so.

21   Q    Okay.  So the theory that you have that the

22   more educated you are, you are more likely to -- that's

23   a reason for dividing these analyses of whether or not

24   the AccuPlacer Test was race neutral or racially biased

25   would not apply to Ms. Naneucli, would it?

98

1              MR. NACHMAN:  Objection, form of the
2        question.
3              THE WITNESS:  I don't agreed with that.
4    BY MR. PADILLA:
5        Q    Why don't you agree with that?
6        A    I believe my statement was, people with
7    different educational backgrounds and different
8    experiences have different likelihoods of passing the
9    test.  I'm sure that you can show me one person for
10   whom that may or may not be true.  But on average, I
11   believe that statement is correct.
12       Q    What empirical basis do you have for that?
13       A    That people who are more educated do better
14   on tests?
15       Q    (Nodding head.)
16       A    I can't recall a specific article that I can
17   cite to, but I believe I can find foundation for the
18   idea that people with more education do better on
19   tests.
20       Q    With the assumption that that test is not
21   racially biased; is that correct?
22             MR. NACHMAN:  Objection, form of the
23       question.
24             THE WITNESS:  I think whether or not the test
25       is racially biased doesn't impact whether or not

105

1    potential lost earnings by classification title, you

2    looked at the number of jobs that were actually filled

3    by the City, not offered; is that correct?

4        A    That is correct.

5        Q    And what was the number of jobs offered by

6    the City that you used as a basis for Table 4?

7            MR. NACHMAN:  Objection to the form of the

8        question.

9            THE WITNESS:  I believe during that time

10       period the City hired 298 individuals.

11   BY MR. PADILLA:

12       Q    And how many job postings were there?

13       A    I believe there were just over 600, but I

14   can't recall the exact number.

15       Q    I think it is 609, if I remember right.

16       A    Seems reasonable.

17       Q    Okay.  Somewhere around there, right?

18       A    Yes, sir.

19       Q    Okay.  And you fault Dr. Bardwell for

20   analyzing the lost earnings, both past lost earnings

21   and future lost earnings, because he used the figure of

22   the job posting, 609, right?

23       A    Yes.

24       Q    And you used the actual hireds of 298?

25       A    Yes.

106

1      Q    Okay.  And you had this conversation, you

2   said, with some members of the City and County of

3   Denver as to, you know, you reference in the report,

4   about why they hired less people than the job postings?

5      A    Yes.

6      Q    Okay.  And did you have any documentation to

7   set forth what the City told you as to the reasons why

8   they didn't hire as many people for the 609 jobs that

9   they posted?

10      A    Yes.

11      Q    And what documentation did you have?

12      A    I don't recall the exact name of the

13   document.  I believe it is something called the Career

14   Service Authority Rules.  One of the items they

15   indicated to me is that when they post for a job, if

16   they don't fill it within 90 days, they have to

17   eliminate the posting and repost the job.

18      Q    How many positions did that fall into, of the

19   609?

20      A    I don't know.

21      Q    You are just saying that there was some sort

22   of rule, and somebody at City and County of Denver, in

23   HR, Ms. Martinez or someone told you, hey, there is a

24   rule here, maybe that's a reason why we didn't fill

25   some of these job postings.  Is that what the basis of

107

1    your information was?

2        A    Well, you didn't let me finish the answer to

3    my question.  What I was going to say was, she

4    indicated there was a rule that indicated if you posted

5    for a job, and 90 days went by without getting it

6    filled, you had to repost the job.

7            And what I was going to tell you was the

8    document, one of the documents I looked at indicated

9    that same rule that she gave to me over the phone.

10   Which was, I think, was your original question, if had

11   any documentation of what she said.

12       Q    Okay.  But what -- how was that quantified

13   that there was anybody that, that -- how many of those

14   609 job postings fell into that area?

15       A    I don't know.

16       Q    Could be one, could be zero?

17            MR. NACHMAN:  Object to the form.

18   BY MR. PADILLA:

19       Q    You don't know?

20            MR. NACHMAN:  Object to the form of the

21       question.

22   BY MR. PADILLA:

23       Q    Is that right?

24       A    It could be.

25       Q    Okay.  Did you have any other documentation

108

1    to support any of the rationale that you set forth in

2    your report as to why you didn't want to use job

3    postings for determining your analysis of the lost

4    earnings by the class of people that were discriminated

5    by -- or contended they were discriminated by the City

6    and County of Denver, and the use of the AccuPlacer

7    Test?

8         A    I don't recall at the moment.  I would have

9    to review the reasons I listed for that, and try and

10   remember if I had documentation for any of those other

11   reasons.

12        Q    Do you remember any of the other reasons,

13   besides this 90-day rule?

14        A    Well, they discussed that they would

15   sometimes post for a job in anticipation of there being

16   turnover in that job.  And then if there wasn't

17   turnover they had expected, then they would not hire

18   somebody.

19             They mentioned that sometimes they would post

20   for jobs, and then whatever budget authority they

21   needed would not come through; and therefore, they

22   ended up not hiring anybody for that job.

23             She mentioned what she called --

24        Q    Who is the she you are talking about?

25        A    Both Ms. Martinez and/or Kellie Hathaway.  I

109

1   can't remember the phrase they used, but there were

2   postings that were essentially ongoing, that never

3   really closed.  So they might have postings for some

4   number of open positions just because that job had a

5   lot of turnover.  And then they just might not have

6   filled everything that they would indicate that the job

7   was posted for.  Those are all that I can remember at

8   the moment.

9       Q    But you do not know the real -- any reason

10  why a particular posting was not filled for a job.

11          MR. NACHMAN:  Objection, form of the

12      question.

13  BY MR. PADILLA:

14      Q    Is that correct?

15      A    That's correct.

16      Q    I think you said it was -- you looked at the

17  job postings as to whether or not the race -- what the

18  race of the persons were for job postings that were not

19  filled; is that correct?

20          MR. NACHMAN:  Objection, form of the

21      question.

22          THE WITNESS:  Not exactly.

23  BY MR. PADILLA:

24      Q    Well, let me see if I can rephrase that.  You

25  looked at the demographics for persons that had passed

110

1    the AccuPlacer Test for job postings that were not

2    filled; is that correct?

3         A    Not exactly, but sort of.

4         Q    Well, tell me what you mean.  Explain that to

5    me.

6         A    I looked at job postings that went unfilled

7    and looked to see if there were qualified -- and by

8    qualified, I mean individuals who passed the test --

9    qualified white applicants who they could have filled

10   those jobs with.

11        Q    And why did you look at that?

12        A    Because under Dr. Bardwell's justification

13   for using postings, the idea would be that they would

14   not fill jobs where all they had was qualified minority

15   candidates.  I wanted to see if those jobs that they

16   didn't fill had qualified white candidates.  If they

17   did, then the reason -- if they did have qualified

18   white candidates, then it is unlikely that they didn't

19   hire somebody because of their race.  They could have

20   just hired a white person.

21        Q    But the only criterion that you used for

22   being qualified is whether they passed the AccuPlacer

23   Test, right?

24        A    That's correct.

25        Q    Okay.  But there were some categories where

111

1   you -- I think there were three different job postings

2   in which there was no -- there was no qualified white

3   candidates, but there were qualified minority

4   candidates; isn't that correct?

5       A    Three of the 63 I looked at had no qualified

6   white candidates.

7       Q    In those three -- but there were -- in those

8   three postings for a job that went unfilled, there were

9   minorities that were qualified?

10      A    I didn't actually look at that.  I don't

11  know.

12      Q    Well, why didn't you?  If the purpose of you

13  looking at this in the first place was to try to see

14  whether Dr. Bardwell's explanation of looking for job

15  postings was significant, was important, why wouldn't

16  you want to know whether or not there was minorities

17  that could have filled those positions and were

18  qualified, but the City didn't hire for that position?

19      A    Since there were 60 out of 63 in which they

20  could have hired a white candidate and chose not to,

21  which is somewhere around 96, 97 percent, that's --

22  that to me indicated evidence that that was, that race

23  was not the reason they were not filling those

24  positions.

25      Q    So as I understand it, you were told by the

136

1    failed those tests respectively?

2        A    That's correct.

3        Q    Now, isn't it true that even if you -- we use

4    your reported results, that your findings don't support

5    your conclusion there is no evidence of disparate

6    impact?

7            MR. NACHMAN:  Objection, form of the

8        question.

9            THE WITNESS:  No, I don't necessarily agree

10       with that statement.

11   BY MR. PADILLA:

12       Q    Are you saying there is no disparate impact

13   in the eight job classifications that you came up with

14   showing that there was disparate impact, the ones you

15   read into the record here today?

16          MR. NACHMAN:  Same objection.

17          THE WITNESS:  There are differences in the

18       past, or if you prefer, fail rates, of minorities

19       versus Caucasians in those eight job

20       classifications.  It is not necessarily the

21       correct conclusion that that is because of race.

22   BY MR. PADILLA:

23       Q    And why do you say then it is not -- what

24   other factors did you have to believe that there is

25   other factors besides race in just giving the

137

1    AccuPlacer Test that eliminated them -- that eliminated

2    these minorities from an opportunity for a job with the

3    City and County of Denver?

4         A    It is possible that the minority and white

5    candidates had different levels of education.  It is

6    possible they had different levels of experience

7    relevant to either the job or the -- or being able to

8    pass the AccuPlacer Test, itself.

9         Q    Well, we are not talking about levels of

10   experience or levels of education or anything.  We are

11   just talking about a test that was given.  And you go

12   in a room, and they give you this test, and you either

13   pass or fail it.  It is -- you know, it is a -- it is a

14   linear function -- I mean it is a -- yeah, that's a

15   linear function thing, isn't it?  It is either yes or

16   no.

17            MR. NACHMAN:  Objection; form of the

18        question.

19   BY MR. PADILLA:

20        Q    You either pass or you don't.

21        A    That's true.  You either pass or you don't.

22        Q    Okay.  So we are not talking about -- for the

23   eight categories that you have, isn't it true that this

24   represents, in fact, 93 percent of the persons that

25   failed the AccuPlacer Test for the eight categories?

140

1        classifications, we don't know that it is because

2        they were minorities.  It may be some other

3        factor.  So it --

4   BY MR. PADILLA:

5        Q    But the other fact, we have already -- you've

6   already -- you said you are a labor economist.  And you

7   believe the numbers, don't you?

8        A    I said I was a labor economist.  I'm not sure

9   that I ever said I believe the numbers, or even what

10  that means, but I'm a labor economist.

11       Q    Okay.  Do you believe in the numbers that you

12  generate, that they are factual and accurate?

13       A    Yes.

14       Q    That you believe that the probability

15  statement that you -- that you have on column -- the

16  last column in Table 2 is accurate?

17       A    Yes.

18       Q    And when you say that -- and despite that,

19  you are saying that you don't know whether or not

20  this -- well, maybe I'm using the term.

21            I said it is more likely than not that the

22  AccuPlacer Test eliminated minorities from employment

23  or promotion with the City and County of Denver based

24  upon their race; is that correct --

25            MR. NACHMAN:  Object to form.

172

1          can use this statistical information to support

2          the contention that the AccuPlacer Test had

3          disparate impact on minorities?"

4               THE WITNESS:  Yes.

5     BY MR. PADILLA:

6          Q     That same question -- I'm going to add the

7     word "and" instead of just African American Hispanics,

8     because it is African American and Hispanics -- your

9     answer would be the same?

10         A     My answer would be the same.

11         Q     Now, let's talk about the mitigation argument

12    that you have.  You assume that any damages -- well,

13    let me, let's back up first of all.

14               Since you did this calculation on Table 4 on

15    Page 19, are you acceding that these eight job

16    classifications on Table 4 that we have already read

17    into the record did have a potential for lost earnings?

18         A     Yes.

19         Q     How did you select five years as being the

20    time period when there would be full mitigation?

21         A     Based on research, a review of some of the

22    research in that area.

23         Q     What do we mean by mitigation, full

24    mitigation?

25               MR. NACHMAN:  Objection, asked and answered.

173

1          THE WITNESS:  Full mitigation essentially

2     means that an individual would be able to achieve

3     the level of earnings that they would have

4     achieved, but for a particular event.

5 BY MR. PADILLA:

6     Q     What is that event in this case?

7     A     Not being employed with the City and County

8 of Denver.

9     Q     And assuming that there are approximately 960

10 class members that's minorities that failed the

11 AccuPlacer Test -- using the lost earnings that you set

12 forth in Table 4, Page 19 of your report -- this would

13 mean that each minority applicant for employment would

14 be entitled to receive about $323; is that right?

15     A     I haven't done that math.

16     Q     Well, it is a little less than 1,000.  If it

17 is 1,000, it is $300, right?

18     A     Okay.

19     Q     So that figure sounds reasonable, doesn't it?

20 I did the math.  It is just simple arithmetic, right?

21     A     It is just simple arithmetic.  It is 300 and

22 some dollars, yeah.

23     Q     Now, you didn't take into consideration

24 anything else about other people that took the

25 AccuPlacer Test in regard to their mental damage or

174

1    suffering, or how they -- how that might have affected

2    them in their applying for jobs with the City and

3    County of Denver in the future?

4         A    That's correct.

5         Q    Getting back to this mitigation issue.  You

6    said, well, I base that upon other information that I

7    became -- that I had, that I mitigated, that there

8    would be full mitigation in five years; is that

9    correct?

10        A    It was based on some economic research.

11        Q    So it is scholarly articles, or what kind of

12   research are you talking about?

13        A    Yes, a scholarly article.

14        Q    And that article is the one mentioned in your

15   report?

16        A    Yes.

17        Q    Michael -- is that footnote number 29 on Page

18   19 of your report?

19        A    Yes.

20        Q    And that's -- so that's the sole basis of you

21   to decide that is going -- that there be full

22   mitigation in five years?

23        A    It is not the sole basis.

24        Q    What other basis did you have?

25        A    Well, economic theory.

175

1      Q     And what economic theory is that?

2      A     Economic theory indicates that individuals

3    who either have a particular job or apply for a

4    particular job, and are then displaced or not hired,

5    whichever it might be, eventually will achieve

6    employment and have the ability to rise to the level of

7    earnings they would have received in that job, that

8    they initially either lost or applied for, assuming

9    that they were qualified for it to begin with.

10     Q     Is this based upon any legal standard?

11           MR. NACHMAN:  Objection, form of the

12     question.

13           THE WITNESS:  I don't know that it has

14     anything to do with legal standards.

15   BY MR. PADILLA:

16     Q     Well, does it have anything to do with any

17   empirical studies or economic studies?

18     A     Yes.

19     Q     And that being this one article from -- how

20   do you pronounce that fellow's name?

21     A     Shahnasarian.  S-H-A-H-N-A-S-A-R-I-A-N.

22     Q     And his article is entitled?

23     A     "Front Pay Damage Assessment: A Summary of

24   Vocational and Psychological Considerations."

25     Q     Did you use any of the information that was

176

1   provided to the City for the 30 some people that we

2   provided detailed information to try to determine what

3   their economic damages were for those individuals?

4        A    No.

5        Q    You understand that Dr. Bardwell tried to

6   make it -- his past and future damages specific to the

7   information that was provided for these individuals in

8   determining past and future damages?

9        A    I understand how he used that data on those

10  individuals, yes.

11       Q    Okay.  Just that aspect of his report.  I

12  understand you have other objections to some of his

13  methodology.  But just that, the methodology of looking

14  at those individual people, do you have any problems

15  with or argument or disagreement with that being a

16  valid method to try to determine past and future

17  damages for class members?

18       A    I have a problem with the way that he used

19  that data.

20       Q    And what his -- what I'm getting at is not --

21  what problems do you have?

22       A    He took the data for those 25 individuals and

23  extrapolated it across the entire 900 and some class

24  members that he calculated damages for, assuming that

25  those 25 people were representative of the entire

177

1    group.

2        Q    Okay.  And why do you have problems with

3    that?

4        A    Well, twofold.  First of all, when you want

5    to extrapolate something across a larger group, you

6    want to make sure that, first of all, that the group

7    you are looking at was picked randomly.

8            I don't believe -- I don't know exactly the

9    foundation for those 25 people, but I have a pretty

10   strong suspicion that it was not randomly selected.

11           Second of all, you want the group that you

12   are using to extrapolate the numbers across, you want

13   that group to be sufficiently large and have some

14   scientific foundation in terms of its size.  I don't

15   think 25 people is large enough to be an unbiased

16   sample for a group of 960 some people.

17       Q    Is there any scientific -- well, in the field

18   of labor economics that you claim to be an expert

19   witness in, or have expertise in -- you haven't been

20   declared an expert witness yet -- but in that field, is

21   there a methodology to determine what is a significant

22   number of people to represent the -- a sample to

23   represent the larger class?

24       A    Yes.

25       Q    Okay.  And what is that?

178

1        A      Well, the formula is somewhat complex.   And I

2    don't have it memorized.   But there are formulas that

3    can tell you, for different error rates and sizes of

4    population, how large you need a sample to be for it to

5    be, for lack of a better phrase, scientifically valid.

6        Q      What is that?   I know you have indicated you

7    don't know the formula.   What is the name of that

8    formula?

9        A      It is -- I don't know that it has name.   It

10   is the formula used for statistical sampling.

11       Q      You don't -- these days you don't actually do

12   the formula yourself anymore, do you?

13            MR. NACHMAN:   Objection, form of the

14         question.

15            THE WITNESS:   I have the formula in my

16         computer in an Excel file.

17   BY MR. PADILLA:

18       Q      So you just put in numbers -- and you don't

19   do these pi square analyses, do you?

20       A      Well, the computer does them.

21       Q      Right.   But you don't do it by hand anymore,

22   do you?

23       A      No, it is not done by hand.

24       Q      With your age, you probably never did it by

25   hand, did you?

179

 1      A    I have done some smaller size groups by hand.

 2   But those probably would have been for presentations,

 3   and not for a case.  I tend to rely on the computer

 4   information.

 5      Q    You are a computer guy, though, right --

 6      A    I --

 7      Q    -- as far as with your mathematical training?

 8      A    I have some computer science classes.  I

 9   understand some things about computers.  I'm not

10   someone you would call a computer guy.

11      Q    Okay.  You didn't use a slide rule like I did

12   for my physics class, did you?

13      A    I don't believe I used a slide rule in

14   physics.  No.

15      Q    Well, in any event, so you plugged this

16   information in to a computer, and you come up with

17   these -- with the -- the probability statements that

18   you come up with; is that correct?

19      A    I use computers to determine -- to perform

20   the statistical calculations, yes.

21      Q    And to determine what the sample size should

22   be, as you indicated in your report; is that correct?

23      A    That's correct.

24      Q    That's what I think we were talking about,

25   that sample size.

180

```
 1              In any event, as a labor economist, sometimes
 2   you have to use what information you have to try to
 3   make projections or estimates; is that correct?
 4       A    I would accept that statement.
 5       Q    And sometimes you use the best evidence, best
 6   information you have available?
 7              MR. NACHMAN:  Objection, form of the
 8         question.
 9              THE WITNESS:  Yes.
10   BY MR. PADILLA:
11       Q    Okay.  So would you agree that the actual
12   loss of income by persons within the class is valid or
13   important information to determine their loss of
14   earnings?
15              MR. NACHMAN:  Objection, form of the
16         question.  For the record, we requested the
17         records on everybody in the class.  And all we've
18         been provided is 25 to 30.
19              THE WITNESS:  I would say that information
20         for specific individuals is usually useful for
21         calculating the damages for those specific
22         individuals.
23   BY MR. PADILLA:
24       Q    Okay.  And in Dr. Bardwell's workbook, he
25   called it his workbook, you had access to that; is that
```

181

1    correct?

2         A    Yes.

3         Q    And you examined that?

4         A    Yes.

5         Q    Did you examine his workbook for calculation

6    of damages for the 30 some people, or 25 to 30 people

7    that we provided detailed information?

8         A    Yes.

9         Q    And did you disagree with his calculations as

10   to their loss of earnings?

11        A    I don't know that I examined those records

12   with the idea of determining whether or not I disagreed

13   or agreed with it.  So I don't know that I have an

14   opinion about the damages he calculated for those

15   specific individuals.

16        Q    Now, Dr. Bardwell, in trying to -- you

17   faulted Dr. Bardwell for using the midpoint of starting

18   wage for -- or the wages for -- let me strike that.

19   I'm getting tired, I guess.

20             MR. NACHMAN:  I can help you out, but I'm

21        not.

22             MR. PADILLA:  No.  Let's take a quick break.

23        I need a drink of water.  That's all.

24             MR. NACHMAN:  Whatever.  Whatever you need.

25             (Brief recess.)

182

1   BY MR. PADILLA:

2       Q    Are we ready to begin, please?

3            Do you go by doctor or mister?

4       A    I go by Charlie.

5       Q    You go by Charlie.  I don't want to call you

6   Charlie in this deposition, seems too familiar.  I just

7   didn't want to offend you if I called you Mr. Mullin.

8       A    Either is fine.

9       Q    Mr. Mullin, you criticized Dr. Bardwell for

10  using the midpoint for all employees in a given

11  position to calculate lost earnings; is that correct?

12      A    That's correct.

13      Q    You used a figure starting wage to calculate

14  lost earnings at the low end of the range for the

15  position; is that correct?

16      A    I think those numbers tend to be towards low

17  end of the ranges, yes.

18      Q    And why did you use the low end?

19      A    I based the lost earnings or the lost

20  starting salaries on the salaries of the individuals

21  that the City and County of Denver actually did hire.

22      Q    Well, if the people that they actually hired

23  were less qualified, less -- had less experience, and

24  the City could maybe get away with paying them less

25  money in the lower range, but if they would have hired

183

1    the ones that were better qualified that were

2    minorities, then they might have had to pay them at a

3    higher range; isn't that correct?

4              MR. NACHMAN:  Objection, form of the

5         question.

6              THE WITNESS:  I don't necessarily agree with

7         your statement.

8    BY MR. PADILLA:

9         Q    In other words, you don't know what the range

10   would have been for the people that were not hired, the

11   appropriate range for them?

12        A    I don't know it, but it is very likely it

13   would have been very similar to the people that were

14   hired.

15        Q    How do you know the City just didn't want to

16   hire people that they could pay less money to, because

17   they could save themselves money by paying people less

18   money to do a job?

19             MR. NACHMAN:  Objection, form of the

20        question.

21             THE WITNESS:  I don't know.

22   BY MR. PADILLA:

23        Q    In your report on Page 14, 15, you make the

24   assumption that anybody that was hired with the City

25   and County of Denver would leave their employ within

184

1   five years; is that correct?

2       A    No.

3       Q    Well, what did you mean by what you said

4   there?

5       A    Which specific sentence are you referring to?

6       Q    Let me get it in front of me.  Well, at the

7   bottom of Page 15, you say you are looking at the

8   Denver employees retirement plan and comprehensive

9   annual financial report.  And you say that the rates

10  listed are likely to be slightly underestimated as they

11  may not include separation on account of disability or

12  death.  Do you see that sentence there?

13      A    Yes.

14      Q    Okay.  And thereafter, you go ahead and read

15  what you put in your report.

16      A    After that?

17      Q    Yes.

18      A    (Reading)  These rates indicate it is

19  expected that 17.9 percent of employees will withdraw

20  from service, either voluntarily or involuntarily

21  within the first year of employment.  An additional

22  15.4 percent would withdraw the year after that, and an

23  additional 13.3 percent, 11.4 percent and 9.9 percent

24  would withdraw in each of the subsequent three years.

25      Q    Then the next sentence.

185

1      A      (Reading)   Thus, after five years, less than

2  half of the original employees would be expected to

3  remain with the City.

4      Q      Okay.  And so, therefore, in your loss

5  earnings calculations that you did, you stopped all

6  mitigation within five years; is that true?

7      A      That is true.

8      Q      And so you said like half of the original

9  employees -- less than half of the original employees

10  would be expected to remain with the City, 48.1 percent

11  on Page 16, which you just read into the record, right?

12      A      That's correct.

13      Q      You did not come to this conclusion based

14  upon any records that were particular to these class

15  members --

16          MR. NACHMAN:  Object to the form.

17  BY MR. PADILLA:

18      Q      -- or minorities that lost -- that didn't get

19  a job?

20          MR. NACHMAN:  Objection --

21  BY MR. PADILLA:

22      Q      You couldn't because they didn't get a job

23  with the City?

24      A      That's correct.

25      Q      Okay.  Did you base it upon the 298 people

186

1    that got jobs with the City?

2        A    Yes.

3        Q    And you determined that 48.1 percent of them

4    wouldn't have -- would be the only original employees

5    that were left?

6        A    No, that's not correct.

7        Q    Well, if you add together these figures that

8    you have, 17.9, 15.4, 13.3, 11.4, 9.9, you get to

9    67.9 percent.  I just added it right here while we were

10   waiting and took our bathroom break.  Okay?

11       A    Okay.

12       Q    So how does that -- but you claim that it is

13   48.1 percent.  But if I take -- that's, that's not --

14   well, what is that?  So that doesn't add up, what you

15   just said.

16       A    Well, first, I did not adjust my damages

17   based on the paragraph that I just read.  That was

18   information from the Denver Employees Retirement Plan.

19            Second, you don't add the numbers.  You have

20   to multiply them.

21       Q    You multiply the percentages?

22       A    Actually, you multiply one minus the

23   percentages for each subsequent year.  So for example,

24   in the first year we would expect -- or it is possible

25   you would have 17.9 percent of the employees leaving,

187

1  which means you would have 82.1 percent of them

2  remaining.  Then you would take that 82.1 percent and

3  multiply the turnover you would expect in the next

4  year.  And then you multiply that result of the

5  turnover in the next year, and so on and so forth.  And

6  that accumulates over the years.

7       Q    Oh, I understand.  It is a cumulative effect.

8  So it actually would be more people that would be

9  leaving the employ of the City and County of Denver?

10      A    More people than what?

11      Q    More people than this 48.1 percent that you

12 have listed here.  How did you come up with that

13 48.1 percent figure?

14      A    The 48.1 percent figure is determined by

15 taking one minus .179, multiplying that by one minus

16 .154, times one minus .133, times one minus .114, times

17 one minus .099.  And that should get you something very

18 close to 48.1 percent.

19           The numbers I used to adjust damages come

20 from the paragraph that follows, which is determined

21 based on the 298 individuals who were hired by the

22 City.  Their turnover rates are slightly different, but

23 the mathematical process would be the same.

24      Q    And you found that that turnover rate is

25 27.5 percent?

188

1      A     For the first year.

2      Q     Then 15, 14, and 9 and 8 and 5.

3      A     Approximately.

4      Q     And when you say turnover rate, are you

5   saying they move -- that they had completely left the

6   employ of the City and County of Denver, or they moved

7   to a different position?

8      A     Left the employment with the City and County

9   of Denver.

10      Q     So how does that affect the estimation of

11   damages?

12      A     It is expected when calculating damages that

13   if there are individuals who are expected to depart

14   employment, then the defendant would no longer be

15   responsible for paying those damages to those

16   individuals because they made a voluntary choice to

17   leave employment.  So they would no longer have been

18   damaged by the defendant.

19      Q     So there is all kinds of assumptions there.

20   One is that they voluntarily left, right?  So you are

21   assuming that everybody that left did so voluntarily?

22      A     No, voluntarily or involuntarily.

23      Q     Well, you said when they voluntarily left,

24   they wouldn't be responsible for the damages.  So I

25   assume that's what you meant because that's what you

243

1      Q      You were asked about some individuals working

2    40 hours a week at a seasonal job.  If somebody worked

3    40 hours a week at a job that lasted six months, how

4    would that, if at all, impact the average for on-call

5    workers, how many hours a week they worked?

6      A      It would have caused the on-call, the average

7    on-call hours to certainly increase beyond 20.  So they

8    would have gone in as someone that worked 40 hours a

9    week.

10     Q      Did you believe that it was an appropriate

11   assumption that all of the persons hired, that were

12   failed to be hired by the City, had they been hired

13   would have continued working until the year 2023?

14     A      No.  I do not believe that's an appropriate

15   assumption.

16     Q      Why not?

17     A      Well, labor markets statistics, one, show us

18   that it is unlikely that individuals or a group of

19   individuals would work for the same firm for 16 or 17

20   years.  So that's within reason.

21            Second of all, the individuals for the City

22   and County of Denver typically have some measure of

23   turnover that is borne out both by the data I was able

24   to review on individuals who were hired and also

25   information from the Denver Employees Retirement System

244

1    report.

2         Q    I hope this is my last question.  Do you

3    recall being asked about the use of the midpoint for

4    compensation as a expected salary of the people who

5    were not hired by the City?

6         A    I recall that.

7         Q    Okay.  Actually it will be more than one

8    question.  Did you review for those particular jobs the

9    salaries of the people who were hired?

10        A    Yes.

11        Q    In that instance, did you find any person of

12   the 298 individuals who were hired as a midpoint of

13   compensation for those positions?

14        A    I reviewed that information for several jobs.

15   I don't know that I reviewed it for all 298; but the

16   several jobs I did examine, I could not find anybody

17   who was hired at a rate equal to or higher than that

18   midpoint.

19             MR. NACHMAN:  Thank you.

20                    REDIRECT EXAMINATION

21   BY MR. PADILLA:

22        Q    I have two other questions.  How long have

23   you worked for ERS?

24        A    It would be 18 years this coming May.

25        Q    So you are above the norm.  You worked 18