**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLORADO**

Civil Case No. 11-cv-00256-MSK-KMT

**MARIAN G. KERNER**, and **RAMONA J. LOPEZ**, on behalf of themselves and all others similarly situated,

Plaintiffs,

v.

**CITY and COUNTY of DENVER**, a municipal corporation.

Defendant.

---

# PLAINTIFFS' CALCULATION OF DAMAGES AND EXPLANATION OF DISCREPANCIES WITH DEFENDANT'S CALCULATIONS PURSUANT TO COURT'S ORAL RULING ON MAY 11, 2016

---

**COME NOW**, the above class member Plaintiffs, by and through their attorneys, Padilla & Padilla, PLLC, and submits to the Court the calculation of damages by Plaintiffs' expert pursuant to the Court's oral ruling on May 11, 2016.

## INTRODUCTION

After an eight day trial to the Court, the Court issued an oral ruling on May 11, 2016. Pursuant to the Court's oral ruling, Plaintiffs and the Defendant exchanged their expert witness damage calculations. Also, pursuant to the Court's ruling the parties conferred and both Plaintiffs and Defendant modified their damage calculations and subsequently attempted to resolve the disparities in the damage calculations by their respective experts. The Plaintiffs' expert damages calculations total $3,002,347. See **EXHIBIT 1**. The Defendant's expert calculates damages at

$1,164,523. See **EXHIBIT 2**. All disparities were not resolved. Disparities remain between the damage calculation by Denver's expert witness, Dr. Robert A. Bardwell and the Defendant's expert witness Dr. Charles Mullin.

In an effort to aid the Court, Plaintiffs have prepared a table in a spreadsheet format which lists each of the issues, resulting in differences in the damage calculations between the Plaintiffs' and Defendant's expert witnesses. This table further sets forth in summary fashion the basis for Dr. Bardwell's calculation, with citations to the Court's ruling and/or exhibits that support Plaintiffs' expert's calculations. Finally, the table will indicate the dollar impact that this issue will have on the ultimate damage calculation. This table is attached hereto and incorporated herein as **EXHIBIT 3**. Plaintiffs will also be submitting to the Court Dr. Bardwell's Excel Workbook as **EXHIBIT 4**.

Judge Krieger's Oral Ruling on May 11, 2016 (Ruling) summarizes the arguments brought at trial, lays out her understanding of each parties analysis, identifies areas of agreement and disagreement, provides judgement on areas of disagreement and provides a formulaic approach to calculating damages. Dr. Bardwell has carefully studied the ruling and Dr. Mullin's damage calculation responding to this ruling. Dr. Bardwell first, independently, calculated damages based on his understanding of the ruling. After comparing both parties damage models, Dr. Bardwell identified six outstanding differences in calculations. As stated above these differences lead Dr. Bardwell to calculate $3,002,347 in damages and Dr. Mullin to calculate $1,164,523 in damages.

The six items at issue are identified as follows:

1. Calculation of additional shortfall by job class;
2. Last Hire 8/18/2008;
3. 20 weeks unemployment;
4. Apply attrition at end of first year;
5. Use of actual city benefits; and
6. 90% graduated accumulated attrition cliff.

All six items at issue are addressed in Judge Krieger's Ruling. However, Dr. Mullin and Dr. Bardwell differ in their interpretation of Judge Krieger's statements regarding these issues. Dr. Bardwell took the following approach in applying the Ruling: Adopt Dr. Mullin's base model and apply the judgments explicitly made in the Ruling. Given the complexity of damage calculations in this case, the appropriate implementation of some explicit judgments in the ruling is ambiguous. In cases where the appropriate implementation of a judgment is ambiguous, Dr. Bardwell implements them in a manner that is consistent with both the ruling and the intrinsic logic underlying Dr. Mullin's model.

Parties generally agree that Dr. Mullin's basic damage calculation model, as presented in **Trial Exhibit 80**, contains an appropriate method for calculating damages. This model contains numerous assumptions, inputs, and calculations that were not specifically challenged at trial nor specifically addressed the Ruling. For the purpose of minimizing the differences between Dr. Bardwell's calculation and Dr. Mullin's calculation, Dr. Bardwell adopts the Microsoft Excel computer files used by Dr. Mullin in his damage calculation.

The new workbook and damage calculation generated by Dr. Mullin in response to the Court's Ruling contained some changes that were either not explicitly ordered by the Court or misapplied the Court's orders. Dr. Bardwell identified the six specific issues enumerated above. For each issue Dr. Bardwell modified Dr. Mullin's workpapers to be consistent with the Court's Ruling.

The dollar impacts of these issues on total damage calculations are interdependent. For the convenience of the Court Dr. Bardwell provides a dollar value associated with each modeling change. These dollar values are arrived at by incorporating each issue into Dr. Mullin's model in sequence, and calculating the sequential difference in damages. If the court adopts the modeling changes in the order as listed, then the damages as indicated are accurate. If there are some changes that are not accepted then there will need to be some adjustments in the damages listed.

## ARGUMENT

The Plaintiffs submit the following argument to support Plaintiffs' expert witness' damage calculations based upon the Court's ruling and the record,[1] addressing the disparities in Dr. Bardwell's and Dr. Mullin's calculations.

**ISSUE 1 – Calculation of Additional Shortfall by Job Classification**

The Court in its oral ruling found that the Plaintiffs class had established that there was disparate impact as to all job classifications (except the ASA I position). See Court ruling page

[1] Given that the Court has requested that this damage calculation be submitted 28 days from the Court's oral ruling on May 11, 2016 coupled with the need for the parties to exchange damage calculations and confer, there has not been sufficient time to order a transcript of the trial proceedings. Also, Plaintiffs have attempted to minimize the costs that would be incurred in regard to ordering an expedited trial transcript, by making limited references to the trial testimony. Plaintiffs will rely upon the Court's notes and memory in regard to any reference to trial testimony. If the Court decides that it will need the full trial transcript in order to make a determination as to the correct damage amount to be awarded Plaintiffs, then Plaintiffs respectfully request an opportunity to present that to the Court.

21, line 22 through page 22, line 2. [Hereinafter Ct.R 21:22 – 22:2]. This ruling required modification of the model presented in **Trial Exhibit 80** to account for additional job classifications. Thus, the shortfall must be calculated using all 20 job classifications instead of the eight used by the Defendant's expert Dr. Mullin. Dr. Bardwell calculates job category specific damages for all job categories with positive shortfall. Dr. Bardwell calculates job categories specific damages for the additional seven job categories in which there was a positive shortfall listed below:

| **Job Classification** | **Shortfall** |
|---|---|
| Human Resources Support Technician | 0.07 |
| Animal Control Investigator | 0.06 |
| Vehicle Impound Clerk | 0.08 |
| Fingerprint Identification Clerk | 0.07 |
| Purchasing Technician | 0.07 |
| Maintenance Control Technician | 0.10 |
| Agency Support Technician | 0.10 |

In contrast Dr. Mullin uses a scale-up method to determine the shortfall for the additional 12 job classifications. See **EXHIBIT 2**. Although Dr. Mullin makes some adjustment for his scale-up model he does not calculate the shortfall for each individual job classification as directed by the Court. The Court in its ruling stated:

> First, the experts will compute shortfall figures. The Court directs that this be done on a classification-by-classification basis.

[Ct.R 51:25 – 52:2].

Separate job class calculations are important to accurately account for differences in salaries, on call status, salary growth rates, and benefits. At several locations in the Ruling, the Court states that certain calculations should be made on a classification by classification basis.[2]

---

[2] *See* Ruling 52:15-16, 52:22-23, 52:10-14, 51:25-52:2.

Dr. Bardwell modifies the **Trial Exhibit 80** model by replicating the methodology used for the 8 original job classifications for the additional 12 job classifications that experience shortfall.[3] Dr. Bardwell method calculates job class specific starting salary, mitigation salary, benefits, and on-call proportions.

Dr. Mullin employs a shortcut to make the damage calculations for the additional job classifications. However, this shortcut directly contradicts the ruling. Dr. Mullin's shortcut involves scaling up damages by the ratio of damages to shortfall for the 8 original job classifications. Dr. Mullin modifies this scale to reflect differences in starting salary. However he does not reflect differences in mitigation salary, benefits, and on-call status between the different job categories. This directly contradicts the Court's ruling.

Thus, Dr. Mullin's scale-up method for determining shortfall by job classification did not comply with the Court's ruling and Dr. Bardwell's calculations which did compute the shortfall by each individual job classification should be adopted. The damage increase is $2,182. While this difference is relatively small relative to total damages, Dr. Bardwell notes that due to the interdependence of each issue the impact of Issue 1 should not be discounted

**ISSUE 2 – Last Hire August 18, 2008**

Dr. Bardwell applies the attrition cliff counting from the last relevant hire date pursuant to the Court's oral ruling on May 11, 2016. In contrast Dr. Mullin applies the attrition cliff counting from the average hire date. The Court's ruling in this regard is as follows:

---

[3] A distinction should be made between a finding of disparate impact and shortfall. A disparate impact exists for 20 job classes while a shortfall exists for only 15 job classes. This difference exists because the disparity is based on AccuPlacer results, while shortfall is based on both AccuPlacer results and actual hires. Parties agree on the total shortfall of 20.5, the 15 job classes that experience this shortfall, and the shortfall applicable to each job class.

> The experts shall cease making damage calculations at the end of 8.2 years from the last hire date at issue here.[4]

[Ct.R 54:3-4].

"The last hire date at issue" is contained in Denver's Attachment 2 to Interrogatory 4A: Hired Applicants which is found at **Trial Exhibit 7**. Sorting **Trial Exhibit 7** by start date you find that the last person hired is Jeffrey Smith hired on August 18, 2008, as a Fingerprint Identification Clerk at the starting salary of $44,868. **Trial Exhibit 7-6**. This is the last hire date at issue. Thus, applying the Court's order Dr. Bardwell applies the fiscal cliff relative to August 18, 2008. Dr. Mullin to the contrary applies the attrition cliff from the average hire date which results in a decrease of damages in the amount of $76,989. Dr. Mullin's calculations directly conflict with the Court's ruling at 54:3-4. Dr. Mullin appears to be superseding the Courts judgment with his own rational. Dr. Bardwell has chosen not to supersede the Ruling with his own rational. It would be unfair to the Plaintiffs to allow the Defendant's expert to deviate from explicit statements in the Ruling where the Plaintiff's expert has intentionally not deviated from the ruling. Therefore Dr. Mullin's calculations of damages must be increased by $76,989.

**ISSUE 3 – 20 Weeks Unemployment**

Dr. Bardwell applies 20 weeks of unemployment prior to starting mitigation. Dr. Mullin applies only 30 days of unemployment prior to starting mitigation. Although the Court in its oral ruling did not directly address the length of unemployment, i.e. the time that it would take for a class member to find alternative employment after being wrongfully denied the opportunity for

---

[4] Later in this document in the section entitled "90% graduated accumulated attrition cliff" Plaintiffs explain Dr. Bardwell's appropriate application of the 8.2 years figure. In the "Last Hire 8/18/2008" section, Plaintiffs explain Dr. Bardwell's determination of the relative date from which the attrition cliff should be measured.

employment with the City and County of Denver, the Court repeatedly referenced that it was accepting the model in regard to mitigation that the parties were generally in agreement as to the calculation of mitigation. The Court stated as follows:

> As the Court understands it, the parties are in agreement that, as a baseline, Dr. Mullin's approach in calculating mitigation earnings is correct.

[Ct.R 34:4-6].

The Court then proceeds to affirm and accept Dr. Mullin's methodology of using Bureau of Labor Statistics (BLS) data in calculating mitigation earnings. [Ct.R 34:6-14]. Next the Court recognized that Dr. Bardwell, although initially proposing a different mitigation analysis, eventually agreed to adopt Dr. Mullin's approach except in two respects. [Ct.R 34:15-18]. The first difference referred to by the Court was in regard to starting salary advocated by Dr. Bardwell versus average salary advocated by Dr. Mullin. [Ct.R 34:19-22]. The Court adopted Dr. Bardwell's approach ruling that the average salary used by Dr. Mullin must be reduced by 17 percent. [Ct.R 38:7-12].

The second disagreement Dr. Bardwell had was in regard to adjustment of mitigation salaries to reflect racial disparities. [Ct.R 38:13-14]. The Court ultimately did not adopts this position by Dr. Bardwell. Thus, when the Court stated that the parties were in agreement in calculating mitigation earnings except for the two categories, the Court acknowledged that the parties were in agreement as to the use of the 20 weeks of unemployment used by Dr. Mullin in his damage analysis that he presented to the Court during the trial. Also see the Court ruling acknowledging that the experts' opinions converged in many significant respects by the end of the trial. [Ct.R 24:4-9].

Dr. Mullin's report, **Trial Exhibit 80** has a lengthy discussion about why and how Dr. Mullion calculated 20 weeks of unemployment prior to beginning mitigation analysis. This is found at **Trial Exhibit 80-17** through **80-18**, wherein Dr. Mullin states as follows:

> Given the nature of this case, a shortfall in hiring, it is first necessary to estimate for those who were allegedly denied positions with the city when they would obtain alternative employment. The U.S. Bureau of Labor Statistics ("BLS") provides a variety of estimates of unemployment duration, including state specific estimates, estimates by race/ethnicity, as well as estimates for specific industries or occupations. The mean duration of unemployment for the U.S. in 2007 was 16.8 weeks and for 2008 was 17.9 weeks.22 The average duration of unemployment for office and administrative support occupations in 2007 was 17.5 weeks and for public administration workers the average was 20.3 weeks in 2007.23 In 2008, those same averages were 19.1 and 21 weeks respectively.24 The mean duration of unemployment for the state of Colorado in 2007 was 14 weeks. For African Americans it was 15.7 weeks and for Hispanics it was 12.7 weeks. 25 Accordingly, we would expect that the class members would be able to obtain employment, on average, approximately 13 to 21 weeks after the time at which they were denied employment with the city. **The potential lost earnings calculations in this report assume that plaintiffs would obtain alternative employment 20 weeks from the start date of the lost earnings period for each of the classification titles**. [Emphasis Supplied].

Thus, Dr. Mullin changing his model and applying mitigation after only 30 days of unemployment is arbitrary. It is anticipated that Defendant will attempt to rely upon the Court's statements in her oral ruling on page 53 lines 6 through 12. This reliance is without merit. It is obvious that the Court in this reference to "a 30-day-after-hiring-date calculation" does not mandate when mitigation is to begin. First of all the Court did not use the term mitigation in this sentence. Secondly, the way in which the Court uses this phrase "30-day-after-hiring-date" it is used as an adjective to describe the calculation. The calculation that is discussed in the previous

sentence is in regard to the salary and benefits paid by Denver. Furthermore the Court further modifies this sentence by saying, " . . . according to the approach that they agreed upon." The approach that was agreed upon was to use 20 weeks of unemployment. Also, most importantly, there was no other evidence presented to the Court not to apply 20 weeks of unemployment in regard to mitigation beginning.

Thus, it is obvious the Court as a fact finder would not have come up with a completely different figure (30 days of unemployment) that neither party presented, accepted or agreed to for the period of unemployment. Thus, Dr. Mullin's damage calculations must be increased by $195,823 pursuant to the calculations presented by Dr. Bardwell in his model and Workbook, **EXHIBIT 4**, under the tab marked "Mitigation Salary."

**ISSUE 4 – Applying Attrition at the End of the First Year**

Dr. Bardwell applies attrition at the end of the first year of damage calculation. Dr. Mullin applies attrition before the first year of damages is completed. The Court does not discuss applying attrition during the first year. [Ct.R 53:9-17].The Court in its order only discusses applying graduated attrition after the first year. [Ct.R 53:18-25]. The Court states specifically as follows:

> **For subsequent years after the first**, the experts will make the same calculations, but will make several adjustments. First, the salary and mitigation figures will be adjusted to reflect wage growth for the year. It's the Court's understanding that the parties agree to the wage growth factor to be used. Second, **the shortfall figure that is applied will be reduced by the accumulated graduated attrition factor** derived from Dr. Mullin's calculations. [Emphasis supplied].

[Ct.R 53:18-25].

This statement from the Court indicates that there is no attrition adjustment in the first year of damage calculations. Dr. Bardwell understands that the accumulated graduated attrition factors referred to by the court is the compound impact of the Dr. Mullin's annual attrition calculations described in the Ruling. For example, Dr. Mullin calculates that after one year of employment, 27 percent of the employees active during the year were not active at the end of the year.[5] Following the Ruling, Dr. Bardwell applies no attrition in the first year of calculations, and reduces shortfall by 27 percent when calculating damages in the second year.

Dr. Mullin's method of applying shortfall directly contradicts the Ruling and is not consistent across job class. Dr. Mullin method applies no attrition for the first 40 days of damages in the Eligibility Technician job class, 293 days in the Executive Assistant I job class, with the remaining job classes having no attrition for periods between 40 and 293 days.[6] Dr. Mullin then applies the first attrition adjustment in the 365 days following the no attrition period. Dr. Mullin's method directly contradicts the Court's ruling by applying attrition before the first year of damages have been calculated. Thus, Dr. Mullin's damage calculations must be increased by $152,773 pursuant to the calculations of Dr. Bardwell.

---

[5] *See* Ruling 47:11-14 "Dr. Mullin reduced the total amount of damages by 27.5 percent to reflect the percentage of hires that left their position that year."

[6] For example The "Elig Tech" tab of Dr. Mullin's New Lost Earnings workbook begins damages in November 21, 2007. From November 21, 2007 to December 31, 2007 the original shortfall of 4.88 is used. After 40 days of damages, shortfall is reduced to account for attrition. The "EA I" tab of Dr. Mullin's New Lost Earnings workbook begins damages in March 14, 2008. From March 14, 2008 to December 31, 2008 the original shortfall of 0.23 is used. After 293 days of damages, shortfall is reduced to account for attrition.

**<u>ISSUE 5 – Use of Actual City Benefits</u>**

An additional area of disagreement between the parties is the amount of benefits to calculate for lost earnings that would have been paid by the City. The Court instructed the parties to compute both salary and benefits from the median starting salary in each job classification and the median value of benefits paid by the City in each job classification to determine loss earnings. Specifically the Court ruled:

> Second, the experts will compute the median starting salary in each job classification based on the evidence in the record. They will add the actual median value of benefits paid by Denver in each classification, as shown in the record. It is the understanding of the Court that both sides' models have used this calculation and that the parties are in agreement as to this method.

[Ct.R 52:15-21].

"The evidence in the record" is **Trial Exhibit 126**, which identifies City provided benefits in 2008. The benefit data provided in **Trial Exhibit 126** identifies average 2008 benefits paid by job class. The first year of damages occurs predominantly in 2008. The actual dollar value of the benefits in **Trial Exhibit 126** should be used in calculating compensation in 2008. Dr. Bardwell uses these figures and provides the full amount of benefits listed in **Trial Exhibit 126** in the first year of employment to the individual job categories. This is appropriate because the first year of damages occurs predominantly in 2008, and therefore the actual benefits are appropriately matched. The majority of benefit value is connected to medical and dental care. These benefits are relevant to all employees in the job class in 2008. These benefits also increase over time as medical care and dental care costs increase. Because actual benefits in periods after 2008 are not available Dr. Bardwell increases benefits proportional to job category salary

growth. This is consistent with how mitigation benefits are increased over time pursuant to the Court's ruling and with how Dr. Mullin increases city benefits over time.

Dr. Mullin and Dr. Bardwell agree on the method used to grow city benefits. However, Dr. Mullin does not use actual city benefits. Dr. Mullin reduces the benefits received by employees approximately 15 to 20 percent in the first year of his calculation relative to the benefits identified in **Trial Exhibit 126**. This is a direct contradiction of the rulings requirement to use actual benefits.

Dr. Bardwell's methodology follows the instructions of the court. The instructions of the Court in regard to this part of the formula are clear. There is no need for further interpretation or deviation as done by Dr. Mullin. The end result of Dr. Mullin's benefit rate is that it scales down benefits that would have been paid by the City. Dr. Mullin's methodology of applying a benefit rate, therefore, is in derogation of the Court's explicit and clear ruling and must be rejected. Thus, Dr. Mullin's damage calculations must be increased pursuant to the Court's directive, by $355,329.

**ISSUE 6 – 90 Percent Graduated Attrition**

Another major area of difference between Dr. Bardwell's damages calculation and Dr. Mullin's damages calculations is how they interpret the Court's direction to apply attrition. The Court's ruling in regard to attrition requires some interpretation. The Court's formula for assessing damages included a component consisting of both graduated attrition and cliff attrition. The Court acknowledged the parties' expert methodology to include a fourth step regarding calculating attrition. The Court stated in its ruling,

> Fourth, that the Court make an attrition calculation. This calculation serves two purposes. First, it operates to reduce the

> damages in each job classification by a particular amount in each year to reflect situations in which those hired by the City would nevertheless have left their positions to seek other opportunities. These departures operate to terminate the damage calculation for those positions. **Second, the attrition figure also reflects a terminal date for the damage calculation, reflecting a point where the Court is comfortable in assuming that all damages payable to the class members resulting from the disparate impact have been accounted for.** [Emphasis supplied].

Ct.R 25:9-20

In the Court's damages formula the Court instructed the parties to apply the accumulated graduated attrition factor derived from Dr. Mullin's calculations subsequent to the first year of damage calculation as stated above (Ct.R 53:18-25).

However, it is unclear what the Court's actual intent was in determining when cliff attrition would be achieved. The Court adopted Dr. Bardwell's cliff attrition methodology using the Cox hazard model for his calculation. Ct.R 51:13-19. The Court agreed that cliff attrition under the Cox hazard model would be reached when 90 percent of the hires will have departed from the City employment through attrition, such that the damage calculation can effectively conclude at that time i.e. when 90 percent of the hires will have departed from the City employment. The Court stated:

> Thus, the Court finds that Dr. Mullin's five-year period does not reflect a reasonable date to assume complete job attrition and, instead, adopts Dr. Bardwell's approach of the 8.2-year cliff attrition date. That reflects a curve that incorporates the continuing employment up to 90 percent attrition, and that is the attrition period that will be used as the cliff attrition point.

Ct. R 51:16-19.

The problem arises in that under the Cox hazard model 90 percent attrition would be achieved after 21 years of employment. Dr. Bardwell's reference to 8.2 years is not when 90

percent attrition would be achieved, but rather 8.2 years is an average work life under the Cox hazard model. See **Trial Exhibit 159**[7] a diagram prepared by Dr. Bardwell illustrating that a substantial amount of attrition occurs after the 8.2 year average employment period. The hazard model predicts that at this point in time, 33 percent of the original hires would be actively employed by the City of Denver. Dr. Bardwell's Cox Hazard model, acknowledged by the Court as a "more reasonable explanation", calculates the 90 percent accumulated attrition to occur at 21 years of employment. This is the identical model that identifies 8.2 years as the average work life with the City of Denver. This value is specific calculation based on actual city employment records.

Therefore, it is necessary to determine the intent of the Court. It is clear that the Court intended for damages to cease when 90 percent of the employees had left the City[8], which would be 21 years from hire, or whether the Court intended for damages to cease at 8.2 years which reflects the average work life of a City employee, not when 90 percent of attrition has been reached.

---

[7] A photograph of Trial Exhibit 159 is attached hereto. It is clear that Dr. Bardwell's diagram referencing the 8.2 years is the average work life since the curve he draws extends our for many years before 90 percent of the employees would have left employment with Denver.

[8] Ct.R 49:21-24 "The Court assumes that Dr. Bardwell's calculation reflects a point in time when 90 percent of the hires will have departed from the City employment through attrition, such that the damage calculation can effectively conclude at that time."

Ct.R 51:16-19 "That reflects a curve that incorporates the continuing employment up to 90 percent attrition, and that is the attrition period that will be used as the cliff attrition point.

Ct.R 25:15-20 "Second, the attrition figure also reflects a terminal date for the damage calculation, reflecting a point where the Court is comfortable in assuming that all damages payable to the class members resulting from the disparate impact have been accounted for.

The Court explores and rejects Defendant's rational for a 5 year attrition cliff. Ct. R 51: 6-13. Plaintiffs understand that the Court intends to apply an attrition cliff that "reflect[s] a reasonable date to assume complete job attrition." Ct. R 51: 14-15. By applying a 90 percent attrition cliff rather than an average work life attrition cliff the Court will recognize that a small portion of employees will remain employed with the city for an extended period. See Accumulated Attrition Under Dr. Mullin's Attrition Rates attached hereto as **EXHIBIT 5** which is a more precise computer generated chart that replicated Dr. Bardwell's hand-drawn chart Trial Exhibit 159 drawn during the trial. This exhibit clearly demonstrates that the 8.2 year reference is to the average work life and the 90 percent attrition would not occur for several years thereafter. **EXHIBIT 5** provides the percentage of employees remaining under Dr. Mullin's annual attrition rates.

The Court's choice of a 90 percent attrition cliff is reasonable given that damages in years prior to the cliff are reduced to account for accumulated attrition. The choice of an average work life attrition cliff is only reasonable if damages are not reduced in each year to account for attrition. Combining the annual reduction for accumulated attrition with an average work life attrition cliff would double count for attrition. This is what Dr. Mullin's damage calculation does.

Dr. Bardwell did not present the 8.2 year average work life as a figure that was appropriate to apply to Dr. Mullin's damage model. He presented it as a figure that was appropriate to apply to his original damage model. This distinction is important because Dr. Bardwell's original model and Dr. Mullin's model both account for attrition, but account for it in

different ways. Dr. Bardwell's initial model did not reduce damages in every year. Because of this, terminating damages after the average work life does not double counting attrition.

Dr. Mullin's model reduced shortfall in each year to account for actual attrition. In addition, Dr. Mullin's revised model applies an attrition cliff at 8.2 years. Given that all parties agree that graduated attrition is appropriate, the 90 percent attrition cliff is a more reliable representation of the point that reflects "a reasonable date to assume complete job attrition." Ct. R 51: 14-15.

The 90 percent accumulated attrition value is reached at 21 years of employment. The Court notes that Dr. Bardwell initially proposed a model of employment length of 16 to 17 years, and that during trial Dr. Bardwell abandoned his position. Ct. R 48: 17-49:4.Dr. Bardwell did not abandon his model. He revised the length of employment used in his damage model from 16 years to 8.2 years. Under his damage model, no attrition would be applied for the first 8.2 years, but damages would cease after 8.2 years. Dr. Bardwell agrees that the graduated attrition approach is appropriate when combined with a 90 percent attrition cliff. The use of a 90 percent (21 year) attrition cliff does not represent a return to his original model. Dr. Bardwell's original model did not reduce the short fall for the accumulated impact of attrition. The current damage calculation presented by Dr. Bardwell incorporates Dr. Mullin's attrition rates, and substantially reduces damages in the later years of employment relative to his original model.

Plaintiffs interpret the Court's intent to be that damages cease when 90 percent attrition is reached and, therefore, Dr. Bardwell's damages calculations has an incremental value of $1,054,720 when calculating attrition at a level when 90 percent of employees would have left City employment.

**<u>Other Issues Regarding Court Entering of Judgment for Plaintiffs</u>**

Plaintiffs further respectfully request the Court take into consideration the following in the entry of judgment of additional sums as follows:

1. That the Class Representatives Marian G. Kerner and Ramona J. Lopez as class representatives have been required to spend an extreme amount of time in fulfilling their duties as class representatives. The Court heard the testimony of both Marian G. Kerner and Ramona J. Lopez at the trial. Plaintiffs request that Marian G. Kerner as representative of the African American/Blacks be awarded an additional $100,000 in regard to her steadfast devotion in filing her claim with the Equal Employment Opportunity Commission (EEOC) and pursuing her claim. Without her efforts this lawsuit would not have been possible, nor would any damages have been awarded to class members. In regard to Ramona J. Lopez the Plaintiffs request that she be awarded $50,000 for her efforts as representative of the Hispanics/Latinos.

2. That the deponents and/or trial witnesses be awarded an additional $500 each for additional time that they have spent in regard to perfecting the claim.

3. That the declarants and/or class members who substantially contributed to the lawsuit by providing historical wage information to counsel for Plaintiffs be awarded an additional $100 for their time.

## <u>CONCLUSION</u>

Plaintiffs class respectfully request that this Court enter judgment as reflected herein and as set forth in Dr. Bardwell's damage calculations as set forth in **EXHIBIT 1**. Dr. Mullin's damage calculations failed to follow the formula set by the Court. Dr. Mullin's damage calculations as reflected at trial and in his current damage calculations are done so with an

attempt to undervalue and minimize the damages to the class representatives. The Plaintiffs merely seek a just award consistent with the Court's ruling to compensate them for Denver's use of the AccuPlacer Test that had a racially disparate impact upon them as African Americans and Latinos denying them the opportunity for employment with the City and County of Denver in violation of Title VII of the Civil Rights Act, 42 U.S.C. § 2000e.[9]

Respectfully submitted,

PADILLA & PADILLA, PLLC


By: s/ Kenneth A. Padilla
KENNETH A. PADILLA
JOAQUIN G. PADILLA
Padilla & Padilla, PLLC
1753 Lafayette Street
Denver, CO 80218
Phone: 303-832-7145
Fax: 303-832-7147
E-mail: Padillaesq@aol.com
E-mail: Joaquin@padillalawoffices.com
***Attorneys for Plaintiffs***


---

[9] Counsel for Plaintiffs notes that counsel for the Defendant has incorrectly indicated that Plaintiffs provided Dr. Bardwell's final Workbook and calculations on June 8, 2016. This is incorrect. Plaintiffs provided the Defendant Dr. Bardwell's final Workbook and calculations on June 7, 2016 after Defendant provided Dr. Mullin's final Workbook and calculations on Friday June 3, 2016. It should also be noted that counsel for Plaintiffs since May 13, 2016, two days after the Court's Ruling repeatedly requested to have a phone conference with Defendant's counsel. The Defendant refused the eight requests by counsel for Plaintiffs. Defendant finally agreed to a phone conference on May 31, 2016. The Defendant's lack of cooperation severely impacted the orderly exchange and reserving time with Plaintiffs' expert to conduct the damage calculations and revisions as were necessary.

<u>**CERTIFICATE OF SERVICE**</u>

I hereby certify that a true and correct copy of the foregoing, **Plaintiffs' Calculation of Damages and Explanation of Discrepancies With Defendant's Calculations Pursuant to Court's Oral Ruling on May 11, 2016** was electronically filed this 8th day of June, 2016 with the Clerk of the Court using the CM/ECF filing system which will send notification of such filing to the following:

Franklin A. Nachman, Esq,
Franklin.nachman@denvergov.org

Kristen A. Merrick, Esq.
Kristen.merrick@denvergov.org
dlefiling.litigation@denver.gov.org
Denver City Attorney's Office

Edward M. Allen, Esq.
eallen@allen-curry.com
Allen & Curry, P.C.
Attorneys for Defendant

s/ Kenneth A. Padilla